**UNITED STATES of America,
Plaintiff,**

v.

**Louis M. RAY and Acme General Contractors, Inc., Defendants.**

**Atlantis Development Corporation, Ltd.,
Intervenor.**

**No. 65–271–Civ.–CF.**

United States District Court
S. D. Florida.
Jan. 2, 1969.

See also, D.C., 281 F.Supp. 876.

Aaron A. Foosaner, Asst. U. S. Atty., for the plaintiff.

Ray and Acme, by Charles E. Davis, of Orlando, Fla., for defendants.

J. Francis Hayden, New York City, for intervenor, Atlantis.

## MEMORANDUM OPINION

FULTON, Chief Judge.

This cause is reminiscent of a fairy tale beginning:

They thought I was crazy when I bought the island. I said it was a bargain * * * They thought it was anarchy to fly my own personal flag * * *[1]

The United States brought this action to prevent private construction atop several coral reefs underlying the high seas. Triumph and Long Reefs are located about four and one-half miles east of Elliot Key, off the southeast coast of Florida, close to Miami.[2] Two separate groups of private entrepreneurs claim the reefs are islands, discovered by them and subject to their colonization. The United States Government charges that the reefs are seabed, subject to its control.

The defendant, Louis M. Ray, envisioned an island nation, the Grand Capri Republic. He testified:

* * * I had originally set out to build an island out there about, I believe it was, five hundred feet wide and two thousand feet long, but I never did obtain any kind of permission if it was necessary out there. So I set out to take possession of the four reefs individually—that is, me and some other investors. And it was my thinking that it would be necessary to claim, occupy and defend the area against all comers in order to lay the proper claim for title to it * * *. [T]hat is namely, Triumph, Long Reef, Pacific Reef, and I believe the other one is Ajax * * *. [W]e decided to move out there and take possession by means of inhabiting the reefs and holding possession of them. That was to be done, of course, in my individual name and my investors' * * *. [W]e had planned to expend several hundred thousand dollars, and Acme General Contractors was planning a big operation to do this work * * *. We were going to

---

1. Donleavy, J. P.; "At Longitude and Latitude," in Meet My Maker the Mad Molecule, pp. 26–28; Delacorte Press, N.Y. (1960).

2. Charted evidence of the reefs first appeared on U. S. Coast & Geodetic Survey Chart No. 166, issued in 1878. More recently, see Coast Survey Chart No. 1249, printed November 27, 1967. The reefs are located at approximately latitude 25° 27' north and longitude 80° 07' west.

bring in hydraulic dredges to build a big island * * *. I went out there and I sat on that island and I built these caissons and a house and I was going to put a family in the house and I going to make some semblance of a defense. And don't get me wrong by saying if I am going to attack the Coast Guard or Navy, but I was going to have some semblance of a defense and I was going to build it and claim it and I occupied it, and I was going to defend it to the best of my ability and I was going to own it. Now, am I a nation? Me and four investors? Transcript pp. 542–43; 555; 597; 600.

Atlantis Development Corporation, Ltd., a Bahamian corporation, intervened in this action. Its officers and directors are speculators who intended to name their country Atlantis, Isle of Gold. Their plans were more sophisticated than Mr. Ray's. William Timothy Thomas Anderson, witness for Atlantis, testified upon cross examination concerning that group's intentions:

Q. What was the total amount [of capital] that it was estimated would be needed?

A. $150,000,000 is what he's got here.

Q. Further on it [intervenor's exhibit No. 20] says, "This is not the total needed for the completion of the full 2,600 acres, but rather 350 acres on Long Reef and 150 acres on Ajax Reef." And does it not say that additional funds will be needed in addition to the $150,-000,000?

A. Yes, sir. It says, "An additional $100,000,000 would be required to complete this entire project."

Q. " * * * or a total of $250,000,-000?"

A. Yes.

Q. And in the very last sentence it says, "Using Miami Beach and Las Vegas as comparables, the price of this land would be worth approximately $1,000,000,000." Is that correct?

A. Yes, sir.

Q. Now, do you have any idea what that was based on?

A. Let me say this, sir. One time there was a group went out there of eighteen millionaires from Miami Beach and walked all around on this, and this one man came back and said, "You don't have a million dollar deal; you've got a billion dollar deal."

Q. That is what it was based on?

A. I know personally that it would be worth more than that. Just if you take the hundred thousand feet on both sides of the reefs, it would give you one hundred thousand—about one hundred ten thousand feet. And I have been told by different men that the land would be worth $8,000 to $10,000 a front foot. That is your ocean frontage, sir.

Q. Was there any reason for including "using Miami Beach and Las Vegas as comparables"?

A. Not especially.

Q. Was it your intention or was it the intention of the present group of which you are a member to establish a gambling casino out there?

A. It was conceived that it could be done.

Q. It was your intent, was it not, to establish what amounts to a new sovereign nation, is that correct?

A. That's correct, sir.

Q. And referring to the last page of Intervenor's Exhibit No. 20, under item 8, you had allotted $1,500,000 for a radio and television station and tower * * *.

* * * * * *

A. Yes, sir. We had a man who wanted to buy that right off of us.

Q. And No. 9, post office, building offices, stamp department and foreign offices, $2,500,000?

A. Yes, sir.

Q. Is that correct?

A. That was for printing stamps and everything else, sir.

Q. And at No. 11 it lists the government palace and congress. That was $1,000,000?

A. That's correct. That's what the man wrote down there.

Q. And then No. 12, "International bank and a mint?"

A. Yes, sir. We had a group that wanted to put a bank there where people could bank by number just as they do in Switzerland.

Q. Was the money * * * to be paid [you] by the currency of Atlantis Isle of Gold?

*   *   *   *   *   *

A. No, sir. It was to be paid not in the currency of the new nation. That was in good old hard American money. Transcript pp. 660–664.

The United States instituted this cause April 9, 1965. Twelve days later the Court entered a preliminary injunction to halt all dredging, filling, or similarly destructive activities on the reefs. On June 10, 1965, the motion of Atlantis to intervene was denied under former Fed.R.Civ.P. 24(a). Upon appeal by Atlantis, the Court of Appeals noted the 1966 Amendments to the Rules and reversed, allowing intervention under new Rule 24(a). In February of 1968, a four day trial was held to determine whether the injunction should be made permanent.

### THE PLEADINGS

The amended complaint is in two counts. The Government charges in Count One that this submerged area appertains to the United States and is subject to its jurisdiction, control and disposition by virtue of the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U.S.C. § 1331 et seq., that the defendants are engaged in activities affecting the seabed and subsoil of the Outer Continental Shelf, and that the action of defendants in building caissons on the reefs, dredging material from the seabed and depositing dredged material within the caissons without authorization constitutes a trespass on Government property. Count Two alleges the defendants are erecting artificial islands or fixed structures on the shelf without required authorization of the Secretary of the Army in violation of Section 4(f) of the Outer Continental Shelf Lands Act. 43 U.S.C. § 1333(f) and 33 U.S.C. § 403.

The defendants contend that the Government is not entitled to the relief sought for the following reasons:

1. The District Court lacks jurisdiction since the reefs and the defendants' actions thereon are outside the territorial limits of the United States.

2. The Secretary of the Army lacks authority to require a permit for construction on the Outer Continental Shelf.

The intervenor interposes a cross claim against the defendants, alleging it has superior title to the property through prior claim, and that the defendants are engaged in an attempt to deprive it of its property, appropriate the benefit of its expenditures, and exploit and develop its discovery, conception, and occupation; that actually the alleged trespass by the defendants is against the intervenor's property.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following facts were stipulated by the parties, and the Court finds as fact that:

a. Defendant Acme is a Florida corporation.

b. Defendant Ray is a resident of Louisiana.

c. Intervenor is a corporation organized under the laws of the Bahamas. Its charter states that it has power

to occupy and develop property located in international waters.

d. Triumph Reef and Long Reef are in close proximity to each other at about latitude 25° 27' north, and longitude 80° 07' west, more than three miles from the coast of the United States, lying in international waters.

e. In late September 1963, the intervenor caused buildings to be taken to the vicinity of the reefs and began to install one building on each of the two reefs. These operations were disrupted by a hurricane, which washed three buildings out to sea, leaving one in place. The District Engineer of the Corps of Engineers, United States Army, at Jacksonville, Florida, issued a written notice dated October 24, 1963, to the intervenor, through its contractor, Surfside 6 Floating Homes, Inc., that Section 10 of the Rivers & Harbors Act of March 3, 1899, 30 Stat. 1151, 33 U.S.C. § 403 makes it unlawful to place any construction in navigable waters of the United States without approval of the Department of the Army, that Section 4(f) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(f), provides that the authority of the Secretary of the Army to prevent obstructions to navigation in navigable waters of the United States is extended to artificial islands and fixed structures located on the Outer Continental Shelf, and that the reported location of the proposed construction by the intervenor is within the Outer Continental Shelf, as defined in the Outer Continental Shelf Lands Act. The notice further advised that an application should be submitted to the Corps of Engineers in accordance with a booklet of instructions which was enclosed. The notice requested early attention to the submission of an application.

f. In or about November, 1963, the intervenor, through its attorney, requested that the Corps of Engineers reconsider and withdraw its request. The matter was then transfered from the Office of the District Engineer at Jacksonville to the Office of the Division Engineer at Atlanta, and subsequently to the Office of the Chief of Engineers at Washington, D. C., which, after discussions and submission of a memorandum by the intervenor, notified the Attorney for the intervenor on or about October 5, 1964, that after consultation with various federal agencies, that Office affirmed the opinion expressed in the letter of the District Engineer dated November 29, 1963, that a Department of the Army permit is required for the proposed construction.

g. On November 16, 1964, defendant Acme made application to the Corps of Engineers for a permit to dredge and bulkhead in the waters at and around Triumph Reef. While this application was pending, the Corps of Engineers issued public notice thereof, sending a copy to the intervenor. The intervenor filed written objections dated December 31, 1964, with the Corps of Engineers, asserting its claim to ownership of the area, referring to intervenor's memorandum on file in the Office of the Chief of Engineers, and stating that the intervenor was considering appropriate means of obtaining judicial determination of the questions under consideration with the Office of the Chief of Engineers. The Corps of Engineers denied Acme's application.

h. In March, 1965, the defendants Ray and Acme proceeded to dredge and fill three circular island formations, two at Triumph Reef and one on Long Reef. They undertook these operations without the con-

sent of the intervenor or the United States.

i. The intervenor did not apply to the Corps of Engineers and no permit was issued to it.

Factually, this case turns on the character of the reefs. The defendants and intervenor argue that the reefs are islands subject to colonization under international law, while the Government claims the reefs are a natural resource of the seabed or subsoil of the Outer Continental Shelf.

The Supreme Court has held that an island is a "naturally-formed area of land surrounded by water, which is above the level of mean high water." United States v. California, 382 U.S. 448, 86 S.Ct. 607, 15 L.Ed.2d 517 (1966). Mean high water was earlier defined by the Court to be the average height of all high waters over a given location during a span of 18.6 years. Borax Consolidated, Ltd., et al. v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935). Since the evidence in this case overwhelmingly established that these reefs are completely submerged at mean high water, they cannot be islands.

The Outer Continental Shelf Lands Act defines the Outer Continental Shelf as all submerged lands lying seaward and outside of the area given to the States under the Submerged Lands Act, of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control, 43 U.S.C. § 1331(a). This definition is open-ended, providing no seaward boundary to the shelf. Congress has considered it to extend at least to a point 100 fathoms (600 feet) deep, H.R. Rep. No. 413, 83rd Congress, 1st Sess. 2 (1953). The 1958 Geneva Convention on the Continental Shelf, Article One, defines the Shelf as:

the seabed and subsoil of the submarine areas adjacent to the coast [and islands] but outside the area of the territorial sea, to a depth of 200 meters [656 feet] or, beyond that limit, to where the depth of superjacent waters admits of the exploration of the natural resources of said area.

These reefs, lying only a short distance off the Florida Coast, fall well within these definitions, and are therefore part of the seabed and subsoil of the United States Outer Continental Shelf.

Evidence abounds that these reefs are a priceless and irreplaceable natural resource of this nation. Formed of the skeletal remains of countless coral organisms deposited over countless centuries, they are mature reefs which have reached their maximum height, but which continue to grow laterally. The entire reef formation stands as a sentry between the coast line and the open sea, protecting grass beds where many varieties of fish feed. The fish live on the reefs, in caves and tangled passageways, protected by their shelter. The reef area is heavily fished, commercially and for sport, and is extensively navigated by commercial and pleasure craft. It is a natural wonderland for skindivers, and a natural laboratory for marine biologists.

The reefs are in close proximity to the John Pennekamp Coral Reef State Park and the Key Largo Coral Reef Fish and Game Preserve.[3] There was also extensive testimony by employees of the National Park Service of the Department of the Interior that Triumph and Long Reefs are in the area encompassed in the proposed Biscayne National Monument. A national monument is an area established for the preservation of a particular resource, similar to a national park.[4]

---

3. These are Florida State Parks.

4. Subsequent to hearing of this case but prior to entry of this memorandum opinion, Congress enacted the Biscayne National Monument Bill. A study of the Act indicates that both Triumph and Long Reefs are located within the boundaries of the new National Monument.

■ The reefs and their coral and piscatorial inhabitants are natural resources not only as that term is understood by the general public, but as defined by law. The Outer Continental Shelf Lands Act incorporates the definition of natural resources which is contained in the Submerged Lands Act, as follows:

The term 'natural resources' includes without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life * * *. 43 U.S.C. § 1301(e).

A somewhat different definition is provided by the Geneva Convention on the Continental Shelf, Article 2(4):

The natural resources referred to in these articles consist of the mineral and other non-living resources of the seabed and subsoil together with living organisms belonging to sedentary species, that is to say, organisms which, at the harvestable stage, either are immobile on or under the seabed or are unable to move except in constant physical contact with the seabed or the subsoil.

The living corals attached to these reefs, as described by expert witnesses, are sedentary.

■ Evidence demonstrated that the dredging and filling operations already accomplished on the reefs and the further work contemplated by the defendants and intervenor has and would continue to do irreparable injury to the reefs and their marine life, which constitute rare and priceless natural resources of this nation.

■■ In summary, the Court adopts the facts stipulated by the parties and further finds that:

1. Triumph and Long Reefs are a part of the Continental Shelf extending seaward from the East Coast of Florida, and all waters overlying the reefs do not exceed one hundred fathoms in depth.

2. Triumph and Long Reefs are completely submerged at all times, except when their highest projections are fleetingly visible while awash at mean low water. Accordingly, Triumph and Long Reefs are part of the "seabed" and "subsoil" of the Outer Continental Shelf within the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. § 1331 et seq.

3. These reefs, together with the organisms attached thereto, are "natural resources" within the Outer Continental Shelf Lands Act, and the Geneva Convention on the Continental Shelf.

4. The caissons positioned by Ray and the jack platform construction or "boathouses" built on pilings proposed by Atlantis constitute "artificial islands and fixed structures * * * erected * * * for the purpose of * * * developing" the reefs, within the Outer Continental Shelf Lands Act.

### JURISDICTION

■ Although the subject matter jurisdiction of this Court was challenged in this cause, federal jurisdiction exists pursuant to:

a. 28 U.S.C. § 1345, as an action brought by the United States;

b. 28 U.S.C. § 1331, as a controversy arising under the Constitution, laws or treaties of the United States, and involving more than $10,000;

c. This Court's general equitable and ancillary jurisdiction; and

d. The Outer Continental Shelf Lands Act:

The United States district courts shall have original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the Outer Continental Shelf for the purpose of exploring for, developing, re-

moving or transporting by pipeline the natural resources, or involving rights to the natural resources of the subsoil and seabed of the Outer Continental Shelf. 43 U.S.C. § 1333(b).

## TRESPASS CLAIM

Count One of the amended complaint charges that the reefs are part of the United States Outer Continental Shelf, the property of the United States, and that the activities of the defendants constitute a trespass to that land. Resolution of this claim depends on the nature of the property interest of the United States.

■ President Truman's Proclamation of 1945, 59 Stat. 884, 10 Federal Register 12303, announced that:

* * * Having concern for the urgency of conserving and prudently utilizing its natural resources, the United States regards *the natural resources of the subsoil and seabed* of the United States as appertaining to the United States, subject to its jurisdiction and control. * * * (Emphasis added.)

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1332, provides that:

It is declared to be the policy of the United States that the subsoil and seabed of the Outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition * * *. This * * * shall be construed in such manner that the character as high seas of the waters above the Outer Continental Shelf and the right to navigation and fishing therein shall not be affected.

The language of the Shelf legislation indicates that Congress intended to claim a less comprehensive interest in the area covered by that Act than the property right it bestowed upon the States under the Submerged Lands Act, where it used the following terminology:

The United States releases and relinquishes unto said States * * *, except as otherwise reserved herein, all right, *title*, and interest of the United States, if any it has, in and to all said lands [beneath navigable waters within the boundaries of the States], improvements, and natural resources * * *. (Emphasis added.) 43 U.S.C. § 1311(b) (1).

That Congress was aware of the effect of the difference in wording of these two Acts is reflected in a Committee Report:

It will be noted that the proclamation [Truman Proclamation] asserted only that the Government of the United States "regards the natural resources of the subsoil and seabed" of the Continental Shelf as "appertaining to" the United States. The provisions of S. 1901 as reported carry this *limited* control a necessary step forward and extend the jurisdiction and control of the United States to the seabed and subsoil themselves. (Emphasis added.) S.Rep. No. 411, 83rd Cong., 1st Session at 7 (1953).

That the claimed interest is something less than fee simple has been judicially recognized:

The Continental Shelf Act was enacted for the purpose, primarily, of asserting ownership of and jurisdiction over the *minerals* in and under the Continental Shelf. Guess v. Read, 290 F.2d 622, 625 (5th Cir. 1961), cert. den., 368 U.S. 957, 82 S.Ct. 394, 7 L. Ed.2d 388 (1962).

This understanding of United States law comports with international law, as expressed by Conventions which differentiate between the complete sovereignty of a coastal state over the area of its territorial sea, and the lesser interest it has in its Outer Continental Shelf:

The *sovereignty* of a coastal state extends to the airspace over the territorial sea as well as to its bed and subsoil. (Emphasis added.) "Convention on the Territorial Sea and Contiguous Zone," Article Two.

The coastal state exercises over the continental shelf *sovereign rights for the purpose of exploring its natural resources.*

\* \* \* \* \* \*

The rights of the coastal state over the continental shelf do not affect the legal status of the superjacent waters as high seas, or that of the airspace above those waters. (Emphasis added.) "Convention on the Continental Shelf," Article 2(1) and (3).

A recent and splendid law review article summarized this facet of the problem as follows:

The United States, acting through the legislative power of the Congress or the treaty making power of the President, has never claimed title to the Shelf or asserted sovereign ownership over it. All it has claimed is the right to explore and exploit the Shelf and formulate regulations to ensure an orderly enjoyment of that right, in a manner consistent with the safety of navigation. Stang, Wet Land: The Unavailable Resource of The Outer Continental Shelf, 2 Journal of Law and Economic Development, 153, 180 (1968).

The gist of the common law action for trespass quare clausum fregit is the unwarranted entry upon the land of another. Such a claim can be made only by an owner in possession, actual or constructive. If an owner is not in actual possession of the property but does have *title* thereto, the title will draw constructive possession to itself, and trespass will lie. However, since the United States is not in actual possession of these reefs, and since it apparently has not claimed their title, it cannot recover under its first count, the trespass claim.

## LACK OF STATUTORY PERMIT CLAIM

Count Two charges that the defendants constructed artificial islands or fixed structures on the Shelf without permission of the Secretary of the Army. The relevant authority of the Secretary of the Army is found in Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river or any other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; \* \* \*.

This authority is extended by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(f):

The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is extended to artificial islands and fixed structures located on the Outer Continental Shelf.

Read together, these statutes provide that neither artificial islands nor fixed structures may be erected on the Outer Continental Shelf without a permit issued under the authority of the Secretary of the Army.

Mr. Ray's caissons and Atlantis' jacks and "boathouses" built on pilings constituted artificial islands and fixed structures within the meaning of the Shelf Act. The defendants and intervenor stipulated that they did not obtain the required permission. The Court, therefore, concludes that the past construction activities of the defendants and intervenor upon the reefs and those contemplated by both are unlawful in the absence of the statutory permit.

## PROPRIETARY CLAIMS OF DEFENDANTS AND INTERVENOR

 The ownership claims of both defendants and the intervenor are not only inconsistent with the provisions of the Outer Continental Shelf Lands Act, but also conflict with the Convention on the Continental Shelf:

> * * * [I]f the coastal State does not explore the Continental Shelf or exploit its natural resources, no one may undertake these activities, or make a claim to the continental shelf, without the express consent of the coastal State. The rights of the coastal State over the Continental Shelf do not depend on occupation, effective or notional, or on any express proclamation.

The Government has not consented to private construction on these reefs.

Because the reefs have been found to be seabed rather than islands, it is unnecessary to consider in detail the international law precedents for establishing island nations, which have been so fully researched and cited by the able lawyers in this litigation. Whatever proprietary interest exists with respect to these reefs belongs to the United States under both national (Shelf Act) and international (Shelf Convention) law. Although this interest may be limited, it is nevertheless the only interest recognized by law, and such interest in the United States precludes the claims of the defendants and intervenor. While recognizing that the Government expressly denies consent to be sued by the intervenor, the Court concludes that all private proprietary claims to the reefs are without merit. The issues of this case are of great public interest, involving not only the preservation of rare natural resources, but the preservation of our very security as a nation. If these reefs were available for private construction totally outside the control of the United States Government, they could conceivably support not only artificial islands and unpoliced gambling casinos, but even an alien missile base, all within a short distance of the Florida Coast. Congress has seen fit to claim this area so that it may be used for the Commonweal rather than private gain.

This Memorandum Opinion shall serve as Findings of Fact and Conclusions of Law, as required by Fed.R.Civ.P. 52(a).