The judgments of the district court will be affirmed.

**UNITED STATES of America,
Plaintiff-Appellee-Cross
Appellant,**

v.

**Louis M. RAY and Acme General Contractors, Inc., Defendants-Appellants-
Cross Appellees,**

**Atlantis Development Corporation, Ltd.,
Intervenor-Appellant-Cross
Appellee.**

**No. 27888.**

United States Court of Appeals,
Fifth Circuit.

Jan. 22, 1970.

As Modified April 10, 1970.

Louis W. Adams, Fort Lauderdale, Fla., J. Francis Hayden, New York City, for Atlantis Development Corp.

Charles E. Davis, Fishback, Davis, Dominick & Salfi, Orlando, Fla., for Louis M. Ray and Acme General Contractors, Inc.

Aaron A. Foosaner, First Asst. U. S. Atty., William A. Meadows, Jr., U. S. Atty., Miami, Fla., Shiro Kashiwa, Asst. Atty. Gen., George S. Swarth, Raymond N. Zagone, Jonathan I. Charney, Attys., Dept. of Justice, Washington, D. C., for the United States; John R. Stevenson, Legal Adviser, Dept. of State, Washington, D. C., of counsel.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Triumph and Long Reefs are two coral reefs which lie in international waters about four and one-half miles off the

southeast coast of Florida, near Miami, and are the subject of this interesting and fantastic controversy between two rival private claimants and the United States. To the District Court (Judge Charles B. Fulton), the case was reminiscent of a fairy tale.[1] To the defendants, the reefs were to become an island nation to be known as Grand Capri Republic; to intervenor, a new sovereign country would be established on the reefs, to be named Atlantis, Isle of Gold. Defendants would organize some semblance of a defense but have no intention of attacking the Coast Guard or Navy. Intervenor envisioned the reefs as a property worth one billion dollars, where a post office, building offices, stamp department and foreign office would be built, as well as a government palace and congress.

The fairy tale has an unhappy ending, with the granting by the District Court of the petition of the United States for a permanent injunction against the activities of defendants and intervenor on these reefs, and by the action which we take here in affirming in part and reversing in part the judgment of the trial court. The dreams of the separate groups for a new nation must perish, like the lost continent "Atlantis," beneath the waves and waters of the sea which constantly submerge the reefs.

The United States brought this action for injunctive relief against Louis M. Ray and Acme General Contractors, Inc. alleging interference with the rights of the United States on coral reefs located on its Continental Shelf on two grounds. In the first count the Government alleged that the activities of these defendants in building caissons on the reefs, dredging material from the seabed and depositing that material within the cais-

sons was causing irreparable injury to the reefs which are subject to the control of the United States, and that these activities constituted trespass. The second count alleged that these activities were being unlawfully conducted without the required authorization of the Secretary of the Army. See 33 U.S.C. § 403; 43 U.S.C. § 1333(f). A preliminary injunction was granted against defendants. Thereafter Atlantis Development Corporation, Ltd., which was also contemplating commercial development of the reefs, was allowed by this Court to intervene in the proceedings.[2] Intervenor filed a cross claim, alleging its superior title to the property by virtue of discovery of the reefs by its predecessor. After an extensive nonjury trial, at which numerous witnesses, lay and expert, testified and at which voluminous exhibits were introduced, the District Court adopted all of the facts stipulated by the parties and further found:

"1. Triumph and Long Reefs are a part of the Continental Shelf extending seaward from the East Coast of Florida, and all waters overlying the reefs do not exceed one hundred fathoms in depth.

"2. Triumph and Long Reefs are completely submerged at all times, except when their highest projections are fleetingly visible while awash at mean low water. Accordingly, Triumph and Long Reefs are part of the 'seabed' and 'subsoil' of the Outer Continental Shelf within the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. § 1331, et seq.

1. Judge Fulton quoted the following as appropriate to his remark:
"They thought I was crazy when I bought the island. I said it was a bargain * * *.
They thought it was anarchy to fly my own personal flag * * *."
Donleavy, J. P.; "At Longitude and Latitude," in Meet My Maker the Mad Mole-

cule, pp. 26–28; Delacorte Press, N. Y. (1960); United States v. Ray, S.D.Fla., 1969, 294 F.Supp. 532.

2. Atlantis Development Corporation v. United States, 5 Cir., 1967, 379 F.2d 818.

"3. These reefs, together with the organisms attached thereto, are 'natural resources' within the Outer Continental Shelf Lands Act, and the Geneva Convention on the Continental Shelf.

"4. The caissons positioned by Ray and the jack platform construction or 'boathouses' built on pilings proposed by Atlantis constitute 'artificial islands and fixed structures * * * erected * * * for the purpose of * * * developing' the reefs, within the Outer Continental Shelf Lands Act."

The District Court denied all claims of defendants and intervenor, granted the claim of the Government under its second count, but denied the Government's claim of trepass under the first count. In so doing, the District Court recognized the sovereign rights of the United States, but concluded that those rights are limited as the claimed interest of the United States is something less than a property right, consisting of neither ownership nor possession, and consequently not supporting a common law action for trespass *quare clausum fregit*.

All parties have appealed. The Government's appeal is limited to the Court's denial of an injunction on count one of the amended complaint. We affirm the District Court's factual findings and its grant of injunctive relief under the Government's second count. However, we reverse the Court's denial of injunctive relief on the first count of the Government's amended complaint.[3]

## LACK OF STATUTORY PERMIT ISSUE:

The District Court correctly concluded that the past and proposed activities of defendants and intervenor were unlawful in the absence of a statutory permit from the Secretary of the Army. Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, prohibits construction in navigable waters of the United States unless the work has been "recommended by the Chief of Engineers and authorized by the Secretary of the Army." The authority of the Secretary of the Army is extended to the Outer Continental Shelf by Section 1333(f) of the Outer Continental Shelf Lands Act, 43 U.S. C. § 1331 et seq.:

"The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is extended to artificial islands and fixed structures located on the outer Continental Shelf."

It is undisputed that defendants and intervenor did not obtain permission or authority for their activities on the reefs. The argument is made that the area is not navigable and therefore not governed by Section 1333(f) of the Outer Continental Shelf Lands Act. Apparently the Court did not, nor do we, deem it necessary to predicate the injunction on navigability of waters covering the reefs, although a specific finding of navigability was made. The quoted section extends the authority of the Secretary to "fixed structures located on the outer Continental Shelf" without regard to the navigability of the particular area involved. If it were necessary to find navigability, however, the evidence amply supports such a finding,[4]

---

3. The Legal Adviser of the Department of State joined in the brief of the United States "as an expression of the official views of that Department concerning the United States' rights and obligations under the Convention on the Continental Shelf." The United States emphasizes in its brief "that it would be contrary to the interests of the United States to claim, at this time, in a domestic court, more rights for the United States over its con-

tinental shelf than are necessary to prevent damage to the interests involved in the particular case." (Reply br. p. 3.)

4. The fact that a portion of a body of water is nonnavigable does not affect the legal character of general navigability of the area. In this respect see United States v. Turner, 5 Cir., 1949, 175 F.2d 644, 647, cert. den., 338 U.S. 851, 70 S.Ct. 92, 94 L.Ed. 521.

and fully establishes that the structures herein involved interfere with the exclusive rights of the United States under the Convention to explore the Continental Shelf and exploit its natural resources. Under the circumstances we do not decide what the result would be if the structures did not interfere with the rights of the United States as recognized by the Convention, our decision being limited to the particular facts of this case.

## THE TRESPASS ISSUE:

It is clear that the reefs in question are within the area designated as the Continental Shelf by both national (Outer Continental Shelf Lands Act, supra) and international (Geneva Convention on the Continental Shelf,[5] 15 U.S.T. 473, executed in 1958 and effective in 1964) law.

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331(a), in pertinent part provides:

"The term 'outer Continental Shelf' means all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301[6] of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control."

Article 1 of the international Convention on the Continental Shelf similarly reads:

"For the purpose of these articles, the term 'continental shelf' is used as referring (a) to the seabed and subsoil of the submarine areas adjacent to the coast but outside the area of the territorial sea, to a depth of 200 metres or, beyond that limit, to where the depth of the superjacent waters admits of the exploitation of the natural resources of the said areas; * * * *" 15 U.S.T. 473.

■ The evidence shows that the reefs are completely submerged at mean high water,[7] and as the Court specifically found, "at all times, except when their highest projections are fleetingly visible while awash at mean low water." Thus the reefs are contemplated within the definition of the Outer Continental Shelf Lands Act and the Geneva Convention on the Continental Shelf, if they meet the definition of "seabed" or "subsoil" contained therein. Webster defines "seabed" as "lands underlying the sea." [8] The evidence establishes that the term "seabed" is commonly understood to be any terrain below the high water line. The federal and common law comports with this understanding in defining the "bed" of a body of water as lands below the ordinary high water mark. See United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 597, 61 S.Ct. 772, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); Alabama v. Georgia, 64 U.S. (23 Howard) 505, 515, 16 L.Ed. 556 (1859); Borough of Ford City, Pennsylvania v. United States, W.D.Pa., 1963, 213 F.Supp. 248, 251; Yellowstone Pipe Line Company v. Kuczynski, 9 Cir., 1960, 283 F.2d 415, 421. The record shows that on the death of the coral, which has a natural predilection for cementing itself onto preexisting rocky structures, its skeletal remains become

---

5. The Convention grew out of the 1958 United Nations Conference on the Law of the Sea at Geneva, and was developed by the International Law Commission of the United Nations.

6. The referred-to section is part of the Submerged Lands Act, 43 U.S.C. § 1301:
   "When used in this chapter—
   (a) the term 'lands beneath navigable waters' means—
       *     *     *     *     *
   (2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide * * *."

7. "Mean high water" has been defined to be the average height of all high waters over a given location during a span of 18.6 years. Borax Consolidated v. City of Los Angeles, 269 U.S. 10, 26, 27, 56 S.Ct. 23, 80 L.Ed. 9 (1935); United States v. California, 382 U.S. 448, 450, 86 S.Ct. 607, 15 L.Ed.2d 517 (1966).

8. Webster's New International Dictionary (3d ed. 1961).

part of the seabed of the Continental Shelf. The District Court's finding that the reefs are part of the "seabed" of the Shelf is fully supported by substantial evidence of record.

■ The same national and international laws (The Outer Continental Shelf Lands Act and the Geneva Convention on the Continental Shelf) explicitly recognize the sovereign rights of the United States and the exclusiveness of those rights to explore the Shelf and exploit its natural resources.

The Outer Continental Shelf Lands Act (43 U.S.C. § 1332(a)) states:

"It is declared to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter."

■ To the extent that any of the terms of the Act are inconsistent with the later adopted Geneva Convention on the Continental Shelf, they should be considered superseded. See Cook v. United States, 288 U.S. 102, 118–119, 53 S.Ct. 305, 77 L.Ed. 641 (1933). But there is nothing in the pertinent language of the Geneva Convention on the Continental Shelf which detracts from or is inconsistent with the Outer Continental Shelf Lands Act. To the contrary, the Geneva Convention confirms and crystallizes the exclusiveness of those rights, particularly with reference to the natural resources of the Shelf.

Article 2 of the Geneva Convention on the Continental Shelf provides:

"1. The coastal State [9] exercises over the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources.

"2. The rights referred to in paragraph 1 of this article are exclusive in the sense that if the coastal State does not explore the continental shelf or exploit its natural resources, no one may undertake these activities, or make a claim to the continental shelf, without the express consent of the coastal State.

"3. The rights of the coastal State over the continental shelf do not depend on occupation, effective or notional, or on any express proclamation.

"4. The natural resources referred to in these articles consist of the mineral and other non-living resources of the seabed and subsoil together with living organisms belonging to sedentary species, that is to say, organisms which, at the harvestable stage, either are immobile on or under the seabed or are unable to move except in constant physical contact with the seabed or the subsoil."

It is unnecessary for us to decide whether the Outer Continental Shelf Lands Act, Section 1332(a), supra (which does not limit the nation's "jurisdiction, control, and power of disposition" to the natural resources of the Shelf), alone confers rights sufficient to authorize the injunctive relief sought. The right of the United States to control those resources is implicit in Article 2, paragraphs 1, 2 and 3, supra, of the Geneva Convention on the Continental Shelf, and explicitly recognized in the Submerged Lands Act, 43 U.S.C. § 1301 et seq. This Act further provides (43 U.S.C. § 1302) the definition of "natural resources" of the Continental Shelf:

"Nothing in this chapter shall be deemed to affect in any wise the rights of the United States to the natural resources of that portion of the subsoil and seabed of the Continental Shelf lying seaward and outside of the area of lands beneath navigable waters, as defined in Section 1301 of this title, all of which natural resources appertain to the United States, and the jurisdiction and control of which by the United States is confirmed."

9.  The term "State" is used here in the sense of "Nation."

Section 1301, referred to within the above-quoted section, defines "natural resources" as including, "*without limiting the generality thereof*, oil, gas, and all other minerals, and *fish*, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, *and other marine animal* and plant *life * * *.*" (Emphasis supplied.) 43 U.S.C. § 1301(e).

Article 2, paragraph 4, of the Geneva Convention on the Continental Shelf includes in its definition of "natural resources" both living and non-living [10] resources, for it defines the term as consisting of " * * * mineral and other non-living resources of the seabed and subsoil together with living organisms belonging to sedentary species. * * * "

Having thus concluded that the United States has the exclusive right for purposes of exploration and exploitation of the reefs, there remains only the question of whether injunctive relief was improperly denied to the Government on its first count which alleged trespass.

Although the complaint is inaccurately framed in terms of trespass in count one, the Government repeatedly stresses that it is not claiming ownership of the reefs. We do not question the District Court's conclusion that the Government's interest, being something less than fee simple, cannot support a common law action for trespass *quare clausum fregit*. But we do not understand that claim to seek such a remedy, despite the language in which the petition is couched. Damages, an inseparable element in the common law action for trespass, are not sought here, and the only relief requested is restraint from interference with rights to an area which appertains to the United States and which under national and international law is subject not only to its jurisdiction but its control as well. It is in this light that we consider the allegations of amended count one.

■ Neither ownership nor possession is, however, a necessary requisite for the granting of injunctive relief. This principle is implicit in the companion decisions of the Supreme Court, United States v. State of Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); United States v. State of Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950), in which injunctive relief was granted to protect "paramount rights" of the United States beyond the territorial limits of Louisiana and Texas, to distances farther out in international waters than that involved here and at a time when those rights had not yet been statutorily established.[11]

In United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L. Ed.2d 903 (1960), the Supreme Court did not consider lack of specific statutory authority a bar to injunctive relief for the United States in an action alleging activities which resulted in obstruction to commerce in a navigable inland river. The test for such relief, the Court said, citing United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747, was "whether the United States had an interest to protect or defend." 362 U.S. at 492, 80 S.Ct. at 890. See also Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L. Ed. 407 (1967); United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940).

■ The evidence overwhelmingly shows that the Government has a vital interest, from a practical as well as an aesthetic viewpoint, in preserving the reefs for public use and enjoyment.

10. Such a specific declaration renders immaterial the controversy of whether the coral composing the reefs is living or dead. Nevertheless, there is abundant evidence to corroborate the District Court's finding that the living corals attached to the reefs are sedentary.

11. Injunction from interferences with the natural resources over which the United States was claiming "sovereign rights" extended to an area 27 miles from the coast in the case against Louisiana, and to the outer edge of the Outer Continental Shelf in the case against Texas (anywhere from 75 to 150 miles of the coast).

The protective underwater crannies of the reefs serve as a haven and spawning ground for myriad species of tropical and game fish. The unique and spectacular formations of the submerged coral deposits attract scores of water sports enthusiasts, skin divers, nature students, and marine researchers. Certain organisms living on the reefs contain substances useful in pharmacology. The reefs protect the inland waters from the heavy wave action of the open sea, thus making the area conducive to boating and other water sports. Congress, intent on conserving the value and natural beauty of the area, recently enacted the Biscayne National Monument Bill establishing the area, which includes both Triumph and Long Reefs, as a national monument.[12] The reefs are a part of the series of coral reefs which dot the coastal and international waters extending out from southeastern Florida. Slightly to the south and west of the Triumph and Long Reefs, and straddling the three-mile dividing line between federal and state waters, is the huge federal-approved John Pennekamp Coral Reef State Park, also known as Key Largo Coral Reef Preserve. The fact that the area is worthy of preservation is abundantly demonstrated by the evidence. But more importantly, the evidence shows that protective action by the Government to prevent despoliation of these unique natural resources is of tantamount importance. There was convincing evidence that the activities of defendants in dredging and filling the reefs has and would continue to kill the sensitive corals by smothering them; that the construction would constitute a navigational hazard to pleasure craft, and would destroy a very productive marine area and other natural resources. Obviously the United States has an important interest to protect in preventing the establishment of a new sovereign nation within four and one-half miles of the Florida Coast, whether it be Grand Capri Republic or Atlantis, Isle of Gold.

The rights of the United States in and to the reefs and the vital interest which the Government has in preserving the area require full and permanent injunctive relief against any interference with those rights by defendants and intervenor.

 We find without merit the additional errors alleged, particularly the challenge to the District Court's jurisdiction. The District Court held, and we agree, that jurisdiction lies under 28 U.S.C. § 1345 (an action by the United States); under 28 U.S.C. § 1331 (a case or controversy arising under the Constitution, laws or treaties of the United States involving more than $10,000); under the Court's general equity and ancillary jurisdiction; and under 43 U.S.C. § 1333(b) (the Outer Continental Shelf Lands Act).

Affirmed in part, reversed in part.

---

12. Pub.L. 90–606, 82 Stat. 1188, October 18, 1968.