UNITED STATES of America, Plaintiff-Appellee,

v.

Chet ALEXANDER, Defendant-Appellant.

No. 78–5676.

United States Court of Appeals, Fifth Circuit.

Sept. 24, 1979.

Rehearing Denied Nov. 15, 1979.

---

Harry Zuckerman, Miami, Fla., for defendant-appellant.

Tack V. Eskenazi, U. S. Atty., Linda Carroll, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and CLARK and VANCE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Chet Alexander, a marine salvor, was convicted by a jury of violating an Interior Department regulation imposing criminal liability upon any person who, without having first obtained a permit, damages a "viable coral community" located on the Outer Continental Shelf (OCS). 43 CFR § 6224.1–1. The main issue of this appeal is whether Section 5(a) of the Outer Continental Shelf Lands Act (the Act), 43 U.S.C.A. § 1334(a), authorizes such a regulation. We hold that it does not. Accordingly, we reverse Alexander's conviction.

### The Wreck Of The Robbie Dale

On May 18, 1977, the shrimper *Robbie Dale* stranded upon a coral reef at Looe Key, about 30 miles off Key West, Florida. The circumstances of the wreck, the identity and whereabouts of captain and crew, all remain a mystery—due no doubt to the presence on board the vessel of approximately 300 bales of marijuana. It suffices that no one came forward to claim the vessel or its cargo. So, the *Robbie Dale*, stripped of her cargo by the Coast Guard, became an abandoned vessel, available for salvage.

On May 19, 1977, while the Coast Guard was off loading the bales of marijuana, the salvage barge *Aquarius,* captained by defendant Chet Alexander, approached the wreck site. Alexander, a veteran commercial salvor with over thirty years' experience in waters of the Keys, radioed the Coast Guard that when the contraband was removed he would salvage the vessel.

Shortly thereafter, Alexander made several trips to the *Robbie Dale* to remove the vessel's electronic equipment and propeller. Then, after a several days' hiatus,[1] Alexander returned to the stricken vessel and removed the vessel's generator and eventually the approximately 3,000 pound engine.

Although Alexander was observed only once while actually working at the wreck site, Alexander's progress was being care-

---

1. In the interval, the vessel had shifted from its original position on top of a coral reef and had slipped into a grove between two reefs.

fully followed by Captain Ed Davidson, the Government's chief witness at trial.

Captain Davidson is a charter boat operator and the owner of a dive shop on a nearby key. As part of his business, Davidson frequently took groups of up to forty people to the Looe Key reefs for snorkeling and scuba diving. Captain Davidson was a leader of the local zoning and planning councils and of several conservationist societies, including a group under Government contract to conduct a "marine resources inventory" of Looe Key.

Finding himself in the happy position of being able simultaneously to serve both the cause of environmentalism and his own economic self-interest in preserving an attractive tourist spot, Captain Davidson took a keen interest in the salvage operations being performed by Alexander at Looe Key. During the approximately two week period between the wreck of the *Robbie Dale* and the removal of the vessel's engine, Davidson inspected the wreckage on every day · but one—either by diving in the area or, on one occasion, by accompanying a Bureau of Land Management marine biologist on an aerial surveillance of the wreckage.[2]

At trial, Davidson testified about his personal observations of the condition of the reef before and after Alexander's salvage operations. Blow-ups of photographs—both underwater and aerial shots—taken by Davidson on his reconnaisance missions were introduced at trial. Upon the Court's establishing Davidson as an experienced diver, Davidson was also permitted to state his opinion regarding the effects of the damage on the coral community.

Viewed in the light most favorable to the Government, *Glasser v. United States*, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, the evidence shows that Alexander damaged the coral on two occasions, each serving as the basis for one count of the two-count information with which Alexander was charged. On about May 24, in an effort to get at the vessel's engine, Alexander, using an acetylene torch, cut apart a boom that had fallen athwart the engine, thereby causing the boom to fall upon and break nearby coral. On about May 30, as Alexander removed the vessel's engine from the coral bed, he caused a long scrape in a ridge of coral. Although Alexander admitted that he cut the pipe and removed the engine, he denied causing any damage to the coral. The jury found otherwise, convicting Alexander on both counts. Alexander was fined $1,000 on each count and ordered to serve concurrent two-year probationary periods. As a condition of probation, the Court ordered that Alexander perform community service work by providing emergency marine assistance to the public at least one day each month or by working one day each month with a civic organization promoting environmental protection.

### *Was The Act A Crime?*

On this appeal, Alexander challenges the Interior Department regulation under which he was convicted.[3] Under this regulation, 43 CFR § 6224.1–1, "[n]o person shall engage in any operation which directly causes damage or injury to a viable coral community that is located on the Outer Continental Shelf without having obtained

2. The marine biologist, Ken Adams, was at Looe Key at the time conducting a "marine resources inventory." The record does not show whether his inventory was related to the one with which Captain Davidson was involved. At any rate, the two men overflew the wreck site together and on at least two occasions Adams chartered Davidson's boat to inspect the site. The biologist was a Government witness at trial.

3. As a second argument, Alexander challenges the District Court's refusal to allow him to argue to the jury that his salvage operation was an emergency action taken to preserve proper-

ty. Under 43 CFR § 6224.4, the permit requirement does not apply "to emergency activities taken to save human lives or property jeopardized at sea." In this case, evidence was introduced at trial showing that the valuable engine of the *Robbie Dale* would have been destroyed if it had not been salvaged within three to four weeks of its submerging, which would have occurred long before a permit could have been obtained. The District Court refused to allow this defense to be raised. Although we question this ruling, we need not decide the issue today.

a permit for said operations." The authority for this regulation is Section 5(a) of the Act. That section provides [4] in part:

The Secretary shall administer the provisions of this subchapter relating [i] to the leasing of the outer Continental Shelf, and shall prescribe [ii] such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time [iii] prescribe and amend such rules and regulations as he determines to be necessary and proper [iv] in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, [v] notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. . . . [vi] Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide for the assignment or relinquishment of leases, for the sale of royalty oil and gas accruing or reserved to the United States at not less than market value, and, in the interest of conservation, for unitization, pooling, drilling agreements, suspension of operations or production, reduction of rentals or royalties, compensatory royalty agreements, subsurface storage of oil or gas in any of said submerged lands, and drilling or other easements necessary for operations or production.[5]

It is the Government's position that, in addition to authorizing the regulation of leasing activities on the OCS, Section 5(a) gives the Secretary of the Interior (the Secretary) an independent authority to issue rules and regulations to protect the natural resources of the OCS. In support of this proposition, the Government points to that provision (see part [iv] *supra*) of Section 5(a) giving the Secretary the authority to "prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf . . . ."

Were this language read in a vacuum, it might support the Government's interpretation. Such is not, however, a proper method of statutory construction. Bearing in mind that a particular clause or phrase of a statute cannot be read in isolation but must be construed as part of a statutory whole, *Brown v. Duchesne,* 1856, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595, 599, we are convinced that when considered in the context of the rest of Section 5(a), the statute gives the Secretary the authority to issue rules and regulations, including conservationist ones, *only* in connection with the administration of OCS mineral leases.[6] Thus, Section 5(a) might give the Secretary the authority to promulgate regulations prohibiting the damaging of coral by OCS lessees or others engaged in operations substantially related to mineral activities, but the section does not give the Secretary the authority to promulgate conservationist measures regulating other activities, such as Alexander's salvage operations, that have nothing to do with mineral leases.

A careful examination of Section 5(a) makes this point abundantly clear. The first sentence of that section (see [i] *supra*)

---

**4.** Bracketed numbers [i], [ii], etc. are inserted for ease of reference.

**5.** The Act was substantially amended in 1978. Outer Continental Shelf Lands Act Amendments of 1978, Pub.L. 95–372, Title II, §§ 201–08, 92 Stat. 632–69. The original language of Section 5(a) is retained, with some modification, in the amended statute. At oral argument before this Court—over eight months after the date of the 1978 Amendments—the Government professed complete ignorance of these amendments. It is distressing that the Government seeks to prosecute individuals under a statute with which it professes so little familiarity.

**6.** Under Sections 6 and 8 of the Act, it is clear that the Secretary's leasing authority is limited to "mineral leases." A mineral lease is "any form of authorization for the exploration for, or development or removal of deposits of, oil, gas, or other minerals." 43 U.S.C.A. § 1331(c).

authorizes the Secretary to make "such rules and regulations" as may be necessary to carry out the provisions of the Act "*relating to the leasing of the Outer Continental Shelf.*" (Emphasis added.) The second sentence (see [iii] *supra*) then provides that the Secretary may prescribe and amend "*such* rules and regulations." (emphasis added) as are necessary to prevent waste and conserve the natural resources of the OCS. It is clear to us that this second provision, when read in context, relates back to and explains the preceding sentence. The provision elaborates upon the first sentence of Section 5(a) by specifying that "such rules and regulations"—*i. e.*, those relating to OCS leases—may include regulations designed to protect the OCS ecological system. The provision is not, as the Government would have it, an independent source of regulatory authority.

█ Our construction is further supported by the final clause of the second sentence (see [iv] and [v] *supra*) of Section 5(a)—the very sentence upon which the Government relies. In this final clause, Congress declared that "such rules and regulations" issued to prevent waste or conserve OCS natural resources "shall apply to all operations conducted under a lease issued or maintained under [the Act]." We think that by expressly making these regulations applicable to leasing operations, Congress intended to exclude their application to other unrelated operations.

The last sentence (see [vi] *supra*) of Section 5(a) is also instructive. Although this sentence has language disclaiming any in-tention to limit the "generality" of Section 5(a), the examples of rules and regulations that may be prescribed "in the interests of conservation" all pertain to mining operations—the subject of OCS leases. None of these examples even remotely resemble the salvage operations sought to be regulated in this case.

In sum, Section 5(a) deals almost exclusively with mineral leasing activities. *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 5 Cir., 1978, 569 F.2d 330, 339; *Guess v. Read*, 5 Cir., 1961, 290 F.2d 622, 625, *cert. denied*, 1962, 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed.2d 388. We will not parse the statutory language of Section 5(a) so as to construe an isolated clause as authorizing a general environmental protection scheme affecting all activities occurring on the OCS.[7] Accordingly, the regulation under which Alexander was convicted, 43 CFR § 6224.1–1, sweeps too broadly.[8]

Furthermore, we think that the Section 5(a) permit scheme is inconsistent with Section 3(b) of the Act, 43 U.S.C.A. § 1332(b). That section provides that the Act "shall be construed in such manner that the character as high seas of the waters above the Continental Shelf and the right to navigation and fishing thereon shall not be affected." Since a person operating legitimately in the high seas over or near a coral reef could not know in advance whether a particular operation might damage coral, a prudent party could protect itself from criminal liability only by obtaining a permit in advance—a procedure that takes at least 60 days. Such a scheme would interfere

---

**7.** This is particularly so since in other instances in which Congress has acted to preserve our marine environment, including coral reefs, it has done so, not obliquely and ambiguously, but has instead enacted specific conservation statutes, typically under Title 16, the conservation title of the United States Code. *See, e. g.,* Crown of Thorns Starfish Act of 1970, 16 U.S.C.A. §§ 1211–13 (to preserve and protect the coral reefs of Hawaii and the United States Pacific Territories); Marine Sanctuaries Act of 1972, 16 U.S.C.A. §§ 1431–34 (to authorize the Secretary of Commerce, after proper consultation, to set aside as sanctuaries marine areas having conservation, recreational, ecological, or esthetic values); Pres. Proclamation No. 3339, 3 CFR 71 (1959–1963), *reprinted in* 16 U.S.C.A. § 461, at 6–7 (to establish Key Largo Coral Reef Preserve).

**8.** The case of *United States v. Ray,* 5 Cir., 1970, 423 F.2d 16, cited by the Government, does not affect our decision. In that case, the Court held that the defendants could be enjoined from building caissons on OCS coral reefs. The case has little, if any, relevance here. That case was not brought under Section 5(a). Nor did it involve or invoke the regulation we hold to be invalid here. Nor was a criminal prosecution brought.

with almost any maritime activity conducted in waters over or near coral reefs, including fishing or, as here, salvage.[9] It is certainly at least arguable that the permit requirement "affects" the right to navigation and fishing on the high seas above the OCS and is therefore beyond the scope of the Act.

### The Government Runs Aground

Alexander's conviction cannot stand. The Secretary exceeded his authority under Section 5(a) in attempting to regulate the activities of this marine salvor. Although preservation of our marine environment—when coupled with due consideration for other legitimate, competing interests—may well be a proper concern of Government, it is for Congress to make that determination by means of explicit statutory authority.

REVERSED.

---

**9.** Captain Davidson's snorkeling and scuba expeditions would also presumably be covered by the permit requirement. The depredations of souvenir-hungry tourists no doubt contribute to the damage and indeed total destruction of many of the coral beds of our waters.