Alfred G. ZABEL and David H. Russell,
Plaintiffs-Appellees,

v.

R. P. TABB, Colonel, Corps of Engineers,
District Engineer, Department of the
Army, Jacksonville, Florida, District;
Stanley R. Resor, Secretary of the
Army; and United States of America,
Defendants-Appellants.

No. 27555.

United States Court of Appeals,
Fifth Circuit.

July 16, 1970.

Rehearing Denied Aug. 10, 1970.

John L. Briggs, U. S. Atty., Tampa, Fla., Glen E. Taylor, Acting Asst. Atty. Gen., Shiro Kashiwa, Asst. Atty. Gen., Edward F. Boardman, U. S. Atty., Tampa, Fla., David D. Hochstein, Roger P. Marquis, S. Billingsley Hill, Attys., Dept. of Justice, Washington, D. C., for defendants-appellants.

Thomas M. Harris, Harris & Harris, St. Petersburg, Fla., for plaintiffs-appellees.

Frank Bezoni, Tampa, Fla., amicus curiae for Coastal Petroleum Co.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

It is the destiny of the Fifth Circuit to be in the middle of great, oftentimes explosive issues of spectacular public importance. So it is here as we enter in depth the contemporary interest in the

preservation of our environment. By an injunction requiring the issuance of a permit to fill in eleven acres of tidelands in the beautiful Boca Ciega Bay in the St. Petersburg-Tampa, Florida area for use as a commercial mobile trailer park, the District Judge held that the Secretary of the Army and his functionary, the Chief of Engineers, had no power to consider anything except interference with navigation. There being no such obstruction to navigation, they were ordered to issue a permit even though the permittees acknowledge that "there was evidence before the Corps of Engineers sufficient to justify an administrative agency finding that [the] fill would do damage to the ecology or marine life on the bottom." We hold that nothing in the statutory structure compels the Secretary to close his eyes to all that others see or think they see. The establishment was entitled, if not required, to consider ecological factors and, being persuaded by them, to deny that which might have been granted routinely five, ten, or fifteen years ago before man's explosive increase made all, including Congress, aware of civilization's potential destruction from breathing its own polluted air and drinking its own infected water and the immeasurable loss from a silent-spring-like disturbance of nature's economy. We reverse.

I

Genesis: The Beginning

In setting the stage we draw freely on the Government's brief. This suit was instituted by Landholders, Zabel and Russell, on May 10, 1967, to compel the Secretary of the Army to issue a permit to dredge and fill in the navigable waters of Boca Ciega Bay, in Pinellas County near St. Petersburg, Florida. On August 15, 1967, the United States and its officers, Defendants-Appellants, filed a motion to dismiss the suit for lack of jurisdiction which was denied. The United States and other defendants then answered the complaint alleging lack of jurisdiction and that the Court lacks power to compel a discretionary act by the Secretary of the Army. The United States and other defendants moved for summary judgment. Landholders, Zabel and Russell, also moved for summary judgment. After a hearing, the District Court, on February 17, 1969, granted summary judgment for Landholders and directed the Secretary of the Army to issue the permit. It granted a stay of execution of the judgment until this appeal could be heard and decided. We invert the summary judgments, reversing Appellees and rendering judgment for the United States.

Landholders own land riparian to Boca Ciega Bay, and adjacent land underlying the Bay. It is navigable water of the United States on the Gulf side of Pinellas Peninsula, its length being traversed by the Intracoastal Waterway, which enters Tampa Bay from Boca Ciega Bay and is thus an arm of the Gulf of Mexico. The Zabel and Russell property is located about one mile from the Intracoastal Waterway.

Landholders desire to dredge and fill on their property in the Bay for a trailer park, with a bridge or culvert to their adjoining upland. To this purpose they first applied to the state and local authorities for permission to perform the work and obtained the consent or approval of all such agencies having jurisdiction to prohibit the work, namely Pinellas County Water and Navigation Control Authority (which originally rejected permission, but ultimately issued a permit pursuant to state Court order),[1]

---

1. The Authority's denial of a permit was affirmed by the Florida District Court of Appeal in Zabel v. Pinellas County Water & Navigation Control Authority, Fla.Ct. App., 1963, 154 So.2d 181. The Supreme Court of Florida reversed that decision because Zabel had been required by the Authority to show that there would be no adverse effect on the public interest, rather than the burden of adverse effect being placed on the Authority. It held that on this record there was insufficient showing of adverse effect, so that denial of a permit would be a taking of property without

Trustees of the Internal Improvement Fund of the State of Florida, Central and South Florida Flood Control District, and Board of Pilot Commissioners for the Port of St. Petersburg.

Landholders then applied to the Corps of Engineers for a federal permit to perform the dredging and filling. The Pinellas County Water and Navigation Control Authority (which originally rejected permission, but ultimately issued a permit pursuant to state Court order) continued to oppose the work as did the Board of County Commissioners of Pinellas County, who also comprise the Pinellas County Water and Navigation Control Authority, the County Health Board of Pinellas County, the Florida Board of Conservation, and about 700 individuals who filed protests. The United States Fish and Wildlife Service, Department of the Interior, also opposed the dredging and filling because it "would have a distinctly harmful effect on the fish and wildlife resources of Boca Ciega Bay."

A public hearing was held in St. Petersburg in November, 1966, and on December 30, 1966, the District Engineer at Jacksonville, Florida, Colonel Tabb, recommended to his superiors that the application be denied. He said that "The proposed work would have no material adverse effect on navigation" [2] but that:

"Careful consideration has been given to the general public interest in this case. The virtually unanimous opposition to the proposed work as expressed in the protests which were received and as exhaustively presented at the public hearing have convinced me that approval of the application would not be in the public interest.

The continued opposition of the U.S. Fish & Wildlife Service despite efforts on the part of the applicants to reduce the extent of damage leads me to the conclusion that approval of the work would not be consistent with the intent of Congress as expressed in the Fish & Wildlife Coordination Act, as amended, 12 August 1958. Further, the opposition of the State of Florida and of county authorities as described in paragraph 5 above gives additional support to my conclusion that the work should not be authorized."

The Division Engineer, South Atlantic Division, Atlanta, Georgia, concurred in that recommendation stating: "In view of the wide spread opposition to the proposed work, it is apparent that approval of the application would not be in the public interest." The Chief of Engineers concurred for the same reasons. Finally, the Secretary of the Army denied the application on February 28, 1967, because issuance of the requested permit:

1. Would result in a distinctly harmful effect on the fish and wildlife resources in Boca Ciega Bay,

2. Would be inconsistent with the purposes of the Fish and Wildlife Coordination Act of 1958, as amended (16 U.S.C. 662),

3. Is opposed by the Florida Board of Conservation on behalf of the State of Florida, and by the County Health Board of Pinellas County and the Board of County Commissioners of Pinellas County, and

4. Would be contrary to the public interest.

Landholders then instituted this suit to review the Secretary's determination and for an order compelling him to issue

---

compensation: It said (p. 381) : "In view of the foregoing, the decision appealed from is quashed and the cause remanded for disposition consistent herewith." Zabel v. Pinellas County Water & Nav. Con. Auth., Fla., 1965, 171 So.2d 376. Against the Authority's contention that this ruling intended further proceedings on the application, to accord it a chance to establish adverse effect, the District

Court of Appeal directed issuance of a permit. Pinellas County Water & Nav. Con. Auth. v. Zabel, Fla.Ct.App., 1965, 179 So.2d 370.

2. There was evidence both that it would aid navigation and that it would obstruct navigation. There was similar evidence on pollution.

a permit. They urged that the proposed work would not hinder navigation and that the Secretary had no authority to refuse the permit on other grounds. They acknowledged that "there was evidence before the Corps of Engineers sufficient to justify an administrative agency finding that our fill would do damage to the ecology or marine life on the bottom." The Government urged lack of jurisdiction and supported the denial of the permit on authority of § 10 of the Rivers and Harbors Act of March 3, 1899, 30 Stat. 1121, 1151, 33 U.S.C.A. § 403, giving the Secretary discretion to issue permits and on the Fish and Wildlife Coordination Act of March 10, 1934, 48 Stat. 401, as amended, 16 U.S.C.A. §§ 661 and 662(a), requiring the Secretary to consult with the Fish and Wildlife Service and state conservation agencies before issuing a permit to dredge and fill.

The District Court held that it had jurisdiction, that the Fish and Wildlife Coordination Act was not authority for denying the permit, and that:

"The taking, control or limitation in the use of private property interests by an exercise of the police power of the government or the public interest or general welfare should be authorized by legislation which clearly outlines procedure which comports to all constitutional standards. This is not the case here.

As this opinion is being prepared the Congress is in session. Advocates of conservation are both able and effective. The way is open to obtain a remedy for future situations like this

one if one is needed and can be legally granted by the Congress."

The Court granted summary judgment for Landholders and directed the Secretary of the Army to issue the permit. This appeal followed.

The question presented to us is whether the Secretary of the Army can refuse to authorize a dredge and fill project in navigable waters for factually substantial ecological reasons even though the project would not interfere with navigation, flood control, or the production of power. To answer this question in the affirmative, we must answer two intermediate questions affirmatively. (1) Does Congress for ecological reasons have the power to prohibit a project on private riparian submerged land in navigable waters? (2) If it does, has Congress committed the power to prohibit to the Secretary of the Army?

II

Constitutional Power

■■ The starting point here is the Commerce Clause[3] and its expansive reach. The test for determining whether Congress has the power to protect wildlife in navigable waters and thereby to regulate the use of private property for this reason is whether there is a basis for the Congressional judgment that the activity regulated has a substantial effect on interstate commerce. Wickard v. Filburn, 1942, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122, 135. That this activity meets this test is hardly questioned.[4] In this time of awakening to the reality that we cannot continue to despoil our environment and yet exist,[5] the nation knows, if Courts

---

3. "The Congress shall have power to regulate Commerce with foreign nations, and among the several states, and with the Indian Tribes." U.S.Const. Art. I, § 8, Cl. 3.

4. Landholders cite Weber v. State Harbor Comm'rs, 1873, 85 U.S. (18 Wall.) 65, 21 L.Ed. 798 and United States v. River Rouge Improvement Co., 1926, 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 as limiting the power of the Federal Government over navigable waters to control for nav-

igational purposes. Not surprisingly, the narrow view these cases take of the Commerce Clause is pre-United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609.

5. Complete documentation of the concern over environmental problems would surely be voluminous, but it is indirectly evidenced by the amount of very recent legal activity. See National Environmental Policy Act of 1969. Pub.Law 91–190 (Jan. 1, 1970), *infra* note 24; Our Waters

do not, that the destruction of fish and wildlife in our estuarine waters does have a substantial, and in some areas a devastating, effect on interstate commerce. Landholders do not contend otherwise. Nor is it challenged that dredge and fill projects are activities which may tend to destroy the ecological balance and thereby affect commerce substantially. Because of these potential effects Congress has the power to regulate such projects.

## III

### Relinquishment of the Power

Landholders do not challenge the existence of power. They argue that Congress in the historic compromise over the oil rich tidelands controversy abandoned its power over other natural resources by the relinquishment to the states in the Submerged Lands Act.[6] By it they urge the Government stripped itself of the power to regulate tidelands property except for purposes relating to (i) navigation, (ii) flood control, and (iii) hydroelectric power. This rests on the expressed Congressional reservation of control for these three purposes over the submerged lands, title to and power over which Congress relinquished to the states.[7]

The argument assumes that when Congress relinquished title to the land

and Wetlands: How the Corps of Engineers Can Help Prevent Their Destruction and Pollution, H.Rep. 91–917, 91st Cong., 2d Sess, March 18, 1970, *infra* text at note 26; Executive Order 11507, Feb. 4, 1970, 38 L.W. 2436; United States v. Ray, 5 Cir., 1970, 423 F.2d 16 [Jan. 22, 1970]; E. B. Elliott Advertising Co. v. Hill, 5 Cir., 1970, 425 F.2d 1141 [April 3, 1970]; Citizens Committee for the Hudson Valley v. Volpe, S.D.N.Y., 1969, 302 F.Supp. 1083, aff'd, 2 Cir., 1970, 425 F.2d 97 [No. 428–33, April 16, 1970]; National Advertising Co. v. Monterey, Calif., 1970, 1 Cal.3d 875, 83 Cal.Rptr. 577, 464 P.2d 33 [Jan. 30, 1970]; MacGibbon v. Duxbury Board of Appeals, Mass., 1970, 255 N.E.2d 347 [Jan. 29, 1970]; California v. SS Bournemouth, C.D.Cal., 1969, 307 F.Supp. 922; Creation of ABA Special Committee on Environmental Quality, 15 Am.Bar News No. 3, March 1970.

6. 43 U.S.C.A. § 1301 et seq. See Continental Oil Co. v. London Steamship Owners' Mut. Ins. Ass'n., 5 Cir., 1969, 417 F. 2d 1030, A.M.C., cert. denied, 1970, 397 U.S. 911, 90 S.Ct. 911, 25 L.Ed.2d 92, A.M.C.; Atlantis Development Corp. v. United States, 5 Cir., 1967, 379 F.2d 818.

7. The relinquishing provision states, 43 U.S.C.A. § 1311(a) and (b):

"(a) It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

(b) (1) The United States releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources   *   *   *."

The reservation provision referred to states, 43 U.S.C.A. § 1311(d):

"(d) Nothing in this chapter shall affect the use, development, improvement, or control by or under the constitutional authority of the United States of said lands and waters for the purposes of navigation or flood control of the production of power, or be construed as the release or relinquishment of any rights of the United States arising under the constitutional authority of Congress to regulate or improve navigation, or to provide for flood control, or the production of power   *   *   *."

The term "natural resources" is broadly defined to include both the animate and inanimate:

"The term 'natural resources' includes, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power;"

43 U.S.C.A. § 1301(e).

and the right and power to manage and use the land, it relinquished its power under the Commerce Clause except in particulars (i), (ii), and (iii). It also assumes that reservation of these three enumerated aspects of the commerce power implied that Congress gave up its plenary power over the myriad other aspects of commerce. See, e. g., Heart of Atlanta Motel, Inc. v. United States, 1964, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed. 2d 258; Katzenbach v. McClung, 1964, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290.

A nice argument can be contrived that the net effect of these provisions was to vest in the adjacent states [1] title in these tidelands and their natural resources and [2] [a] the exclusive power to use, exploit and manage these lands [b] only subject to the reserved power of the Federal Government regarding (i) navigation, (ii) flood control, and (iii) production of power. Certainly, this brief synopsis of (1) and (2) (a) is the literal import of § 1311(a) (1) (2). Likewise, the reservation summarized as (2) (b) is literally specified in § 1311 (d). On this approach, the Federal Government turned over to adjacent states the full management and use of the tidelands reserving only those limited powers over commerce comprehended within the three particulars.

But this argument ignores both language found elsewhere and the legislative purpose of the Act. The controversy, often pressed with emotional overtones, was over oil and gas and whether the states were to reap the economic benefits of development royalties and to regulate the exploration and development or whether these benefits and these controls were to be exercised by the Federal Government as an adjunct of then newly declared "paramount rights". United States v. California, 1947, 332 U.S. 804, 805, 68 S.Ct. 20, 21, 92 L.Ed. 382, 383. The Act and this relinquishment reflect the legislative compromise found in the combination of the Submerged Lands Act and the Outer Continental Shelf Act.[8] The adjacent states were to be the "owner" of the resources and reap exclusively the economic benefits of resources in the tidelands and have full control over management and exploitation. The Federal Government, on the other hand, was given exclusive ownership and control vis-a-vis the states in the Outer Continental Shelf.

Although it was easy to make this division, the nature of the physical area of the controversy presented immediate operational problems growing out of the water. The Federal Government's traditional concern with navigation, especially on the high seas, its later but then quite extensive concern in flood control, hydroelectric power production, and the frequent combination of both under grandiose projects of a Corps of Engineers, raised specific problems calling for accommodation of the (i) sweeping Federal divesture and (ii) the continued fulfillment of the Federal government's role in these activities. Thus, for example, the states' exclusive right to grant exploration privileges, determine the location and spacing of development wells or drilling platforms posed prospects of maritime hazards. Without imposing its own notions of how development ought to be conducted, restricted, expanded, or controlled, the Federal Government had to have, and reserved expressly this power even to prohibit a drilling rig platform at a particular location. These specific reservations eliminated these frequent and extensive activities as a source of further state versus national controversy.

Whatever remaining doubt there might be on this reading was expressly eliminated by language in § 1314(a) which specifically retains in the Federal Government "all of its * * * rights in and powers of regulation and control of said lands and * * * waters for the constitutional purposes of commerce * * *"

8. 43 U.S.C.A. § 1331 et seq.

43 U.S.C.A. § 1314(a).[9]  This section, which encompasses and pervades the entire Act, makes it clear that Congress intended to and did retain all its constitutional powers over commerce and did not relinquish certain portions of the power by specifically reserving others.[10]

All of this is additionally borne out by the legislative history [11] and United States v. Rands, 1967, 389 U.S. 121, 127, 88 S.Ct. 265, 269, 19 L.Ed.2d 329, 335:

> "Finally, respondents urge that the Government's position subverts the policy of the Submerged Lands Act, which confirmed and vested in the States title to the lands beneath navigable waters within their boundaries and to natural resources within such lands and waters, together with the right and power to manage, develop, and use such lands and natural resources. However, reliance on that Act is misplaced, for it expressly recognized that the United States retained all its navigational servitude and

rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership * * *. Nothing in the Act was to be construed as the release or relinquishment of any rights of the United States arising under the constitutional authority of Congress to regulate or improve navigation, or to provide for flood control, or the production of power. The Act left congressional power over commerce and the dominant navigational servitude of the United States precisely where it found them."

Congress clearly has the power under the Commerce Clause to regulate the use of Landholders' submerged riparian property for conservation purposes and has not given up this power in the Submerged Lands Act.

9. "The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by section 1311 of this title."
43 U.S.C.A. § 1314(a).

10. It is argued that the retention in § 1314 (a) is limited to the three aspects enumerated in § 1311(d) by the words "[the commerce power] shall be paramount to, but shall not be deemed to include [relinquished rights]." But we have already shown that the enumeration of these three, which are explicitly stated because they are particularly relevant to the regulation of land lying under navigable waters, does not imply that Congressional power over other types of commerce was among the rights relinquished.

Because Congress did not give up any of its power over all of interstate commerce in § 1311 (see note 7, *supra*), they are not "[relinquished rights]" and the limitation portion of § 1314(a) is inapplicable.

To hold otherwise would render the reservation of constitutional commerce power in § 1314(a) a useless reiteration of the impliedly retained powers in § 1311(d). But to hold that it is an explicit reservation of all commerce powers gives the section meaning.  The section may be unneeded and overly cautious in that it reserves a constitutional power that has been relinquished, but it should not be read in such a way as to render it otherwise useless.

11. "This title does not affect any of the Federal constitutional powers of regulation and control over these areas within State boundaries.  Such powers, as those over navigation, commerce, national defense, international affairs, flood control, and power production where the United States owns or acquires the water power."
H.R.Rep.No. 215, 83d Cong., 1st Sess. (March 27, 1953), 1953 U.S.Code Cong. & Admin.News, pp. 1385, 1389.

## IV

### Prohibiting Obstructions to Navigation

The action of the Chief of Engineers and the Secretary of the Army under attack rests immediately on the Rivers and Harbors Act, 33 U.S.C.A. § 403, which declares that "the creation of any obstruction \* \* \* to the navigable capacity of any of the waters of the United States is prohibited." [12] The Act covers both building of structures and the excavating and filling in navigable waters. It is structured as a flat prohibition *unless*—the unless being the issuance of approval by the Secretary after recommendation of the Chief of Engineers.[13] The Act itself does not put any restrictions on denial of a permit or the reasons why the Secretary may refuse to grant a permit to one seeking to build structures on or dredge and fill his own property. Although the Act has always been read as tempering the outright prohibition by the rule of reason against arbitrary action, the Act does flatly forbid the obstruction. The administrator may grant permission on conditions and conversely deny permission when the situation does not allow for those conditions.

But the statute does not prescribe either generally or specifically what those conditions may be. The question for us is whether under the Act the Secretary may include conservation considerations as conditions to be met to make the proposed project acceptable. Until now there has been no absolute answer to this question. In fact, in most cases under the Rivers and Harbors Act the Courts have been faced only with navigation problems." [14] See, e. g., Sanitary

---

12. "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."
33 U.S.C.A. § 403.

13. This Court recently held that under this same section together with the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1333(f), a permit must be obtained before a project can be begun on the Outer Continental Shelf. United States v. Ray, *supra*, note 5, which followed the remand and trial on the merits in Atlantis Development Corp. v. United States, 5 Cir., 1967, 379 F.2d 818.

14. Landholders cite authority holding that the Secretary is empowered to deny a permit only for navigational reasons, United States Attorney General's *opinion of* February 13, 1925, 30 U.S.Atty.Gen.Ops. 410 at 412, 415, 416; Miami Beach Jockey Club, Inc. v. Dern, 1936, 66 App.D.C. 254, 86 F.2d 135, 136 (on petition for rehearing). These determinations, by no means inexorable under the wording of the statute, see Greathouse v. Dern, *infra*, predate the changes wrought by the Fish and Wildlife Coordination Act, *infra*.

And they are out of step with the sweeping declaration of power over commerce in United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 423–427, 61 S.Ct. 291, 307, 85 L.Ed. 243, 261–263:

"The state and respondent, alike, however, hold the waters and the lands under them subject to the power of Congress to control the waters for the purpose of commerce. The power flows from the grant to regulate, i. e., to 'prescribe the rule by which commerce is to be governed.' This includes the protection of navigable waters in capacity as well as use. This power of Congress to regulate commerce is so unfettered that its judgment as to whether a structure is or is not a hindrance is conclusive. Its determination is legislative in character. The Federal Government has domination over the water power inherent in the flowing stream. It is liable

Dist. v. United States, 1925, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352; Wisconsin v. Illinois, 1929, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426; United States v. Republic Steel Corp., 1960, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903.

One very big exception is United States ex rel. Greathouse v. Dern, 1933, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250. There petitioners sought a writ of mandamus to compel the Secretary of War and the Chief of Engineers to issue a permit to build a wharf in navigable waters. The Secretary, specifically finding that it would not interfere with navigation, denied the permit. The Supreme Court held that mandamus would not issue because the allowance of mandamus "is controlled by equitable principles * * * and it may be refused for reasons comparable to those which would lead a court of equity, in the exercise of a sound discretion, to withhold its protection of an undoubted legal right." The reason was that the United States had plans to condemn petitioners' land for use as a means of access to a proposed parkway. Allowing a wharf to be built would increase the expense to the government since it would increase the market value of the land and would require the government to pay for tearing down the wharf. The importance of

*Greathouse* is that it recognized that the Corps of Engineers does not have to wear navigational blinders when it considers a permit request. That there must be a reason does not mean that the reason has to be navigability.

Another case holds that the Corps has a duty to consider factors other than navigational. Citizens Committee for the Hudson Valley v. Volpe, S.D.N.Y., 1969, 302 F.Supp. 1083, aff'd., 2 Cir., 1970 425 F.2d 97 [No. 428–33, April 16, 1970]. There the District Court held that the Corps must consider a fill project in the context of the entire expressway project of which it was a part rather than just considering the fill and its effect on navigation. The reasoning was that the approval of the Secretary of Transportation was necessary before a proposed causeway could be constructed. The causeway, along with the fill, was an integral part of the expressway project. However, if the Corps and Secretary of the Army approved the fill and the State completed it, the Secretary of Transportation, considering the enormous expense of the fill, would have no choice, other than approving the causeway. The Army thus had exceeded its authority in approving the fill on only navigational considerations since approval of the fill was effectually approval of the causeway.[15]

to no one for its use or nonuse. The flow of a navigable stream is in no sense private property; 'that the running water in a great navigable stream is capable of private ownership is inconceivable.' Exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion."

\*   \*   \*   \*   \*   \*

"In our view, it cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. By navigation respondent means no more than operation of boats and improvement of the waterway itself. In truth the authority of the United States is the regulation of commerce on its waters. Navigability, in the sense just stated, is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utiliza-

tion of power are likewise parts of commerce control. * * * That authority is as broad as the needs of commerce. * * * The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government. The license conditions to which objection is made have an obvious relationship to the exercise of the commerce power. Even if there were no such relationship the plenary power of Congress over navigable waters would empower it to deny the privilege of constructing an obstruction in those waters."

15. The Court essentially held that the Corps, where approval of Transportation is also required, cannot be oblivious to the effect of fill projects on the beauty and conservation of natural resources. This inference arises from the fact that the Secretary of Transportation is statu-

But such circuity is not necessary. Governmental agencies in executing a particular statutory responsibility ordinarily are required to take heed of, sometimes effectuate and other times not thwart other valid statutory governmental policies. And here the government-wide policy of environmental conservation is spectacularly revealed in at least two statutes, The Fish and Wildlife Coordination Act [16] and the National Environmental Policy Act of 1969.[17]

■ The Fish and Wildlife Coordination Act [18] clearly requires the dredging and filling agency (under a governmental permit), whether public or private, to consult with the Fish and Wildlife Service,[19] with a view of conservation of wildlife resources. If there be any question as to whether the statute directs the licensing agency (the Corps) to so consult it can quickly be dispelled. Common sense and reason dictate that it would be incongruous for Congress, in light of the fact that it intends conservation to be considered in private dredge and fill operations (as evidenced by the clear wording of the statute), not to direct the only federal agency concerned with licensing such projects both to consult and to take such factors into account.

■ The second proof that the Secretary is directed and authorized by the Fish and Wildlife Coordination Act to consider conservation is found in the legislative history. The Senate Report on the Fish and Wildlife Coordination Act states:

"Finally, the nursery and feeding grounds of valuable crustaceans, such as shrimp, as well as the young of valuable marine fishes, may be affected by dredging, filling, and diking operations often carried out to improve navigation and provide new industrial or residential land.

\* \* \* \* \* \*

Existing law has questionable application to projects of the Corps of Engineers for the dredging of bays and estuaries for navigation and filling purposes. More seriously, existing law has no application whatsoever to the dredging and filling of bays and estuaries by private interests or other non-Federal entities in navigable waters under permit from the Corps of Engineers. This is a particularly serious deficiency from the standpoint of commercial fishing interests. The dredging of these bays and estuaries along the coastlines to aid navigation and

torily required to consider conservation before granting a permit. But if the fill on which the causeway was to be built were completed at the time the permit for the causeway was requested, there would be no conservation factors for Transportation to consider. The Court held that the Corps could not blind itself to this fact and thereby cut off considerations of conservation by granting a fill permit without Transportation's approval of the causeway.

16. 16 U.S.C.A. §§ 661–666.

17. Public Law 91–190, 42 U.S.C.A. §§ 4331–4347.

18. The Fish and Wildlife Coordination Act states:
  "Except as hereafter stated in subsection (h) of this section [not applicable], whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water other-

wise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the impoundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development."
  16 U.S.C.A. § 662(a).

19. Presumably Landholders must first obtain the Corps of Engineers' permit before becoming a "private agency under Federal permit or license."

also to provide land fills for real estate and similar developments, both by Federal agencies or other agencies under permit from the Corps of Engineers, has increased tremendously in the last 5 years. Obviously, dredging activity of this sort has a profound disturbing effect on aquatic life, including shrimp and other species of tremendous significance to the commerical fishing industry. The bays, estuaries, and related marsh areas are highly important as spawning and nursery grounds for many commerical species of fish and shellfish." [20]

S.Rep. No. 1981, 85th Cong.2d Sess. (July 28, 1958). 1958 U.S.Code Cong. & Admin.News, pp. 3446, 3448, 3450. This Report clearly shows that Congress intended the Chief of Engineers and Secretary of the Army to consult with the Fish and Wildlife Service before issuing a permit for a private dredge and fill operation.

This interpretation was judicially accepted in Udall v. FPC:

"Section 2(a), 16 USC § 662(a) provides that an agency evaluating a license under which 'the waters of any stream or other body of water are proposed * * * to be impounded first shall consult with the United States Fish and Wildlife Service, Department of the Interior * * * with a view to the conservation of wildlife resources by preventing loss of and damage to such resources * * *.' Certainly the wildlife conservation aspect of the project must be explored and evaluated."

1967, 387 U.S. 428, 443–444, 87 S.Ct. 1712, 1720, 18 L.Ed.2d 869, 879.

The meaning and application of the Act are also reflected by the actions of the Executive that show the statute authorizes and directs the Secretary to consult with the Fish and Wildlife Service in deciding whether to grant a dredge and fill permit.

In a Memorandum of Understanding [21] between the Secretary of the Army and

---

20. The Senate Report also shows how the exercise of the commerce power in the conservation arena ties in with its exercise in other areas:

"The amendments proposed by this bill would remedy these deficiencies and have several other important advantages. The amendments, would provide that wildlife conservation shall receive equal consideration with other features in the planning of Federal water resource development programs. This would have the effect of putting fish and wildlife on the basis of equality with flood control, irrigation, navigation, and hydroelectric power in our water resource programs, which is highly desirable and proper, and represents an objective long sought by conservationists of the Nation."

1958 U.S.Code Cong. & Admin.News, at 3450.

21. "POLICIES

1. It is the policy of the two Secretaries that there shall be full coordination and cooperation between their respective Departments on the above responsibilities at all organizational levels, and it is their view that maximum efforts in the discharge of those responsibilities, including the resolution of differing views, must be undertaken at the earliest practicable time and at the field organizational unit most directly concerned. Accordingly, District Engineers of the U. S. Army Corps of Engineers shall coordinate with the Regional Directors of the Secretary of the Interior on fish and wildlife, recreation, and pollution problems associated with dredging, filling, and excavation operations to be conducted under permits issued under the 1899 Act in the navigable waters of the United States, and they shall avail themselves of the technical advice and assistance which such Directors may provide.

2. The Secretary of the Army will seek the advice and counsel of the Secretary of the Interior on difficult cases. If the Secretary of the Interior advises that proposed operations will unreasonably impair natural resources or the related environment, including the fish and wildlife and recreational values thereof, or will reduce the quality of such waters in violation of applicable water quality standards, the Secretary of the Army in acting on the request for a permit will carefully evaluate the

the Secretary of the Interior, it is provided that, upon receipt of an application for a permit to dredge or fill in navigable waters, the District Engineer of the Corps of Engineers concerned is required to send notices to all interested parties, including the appropriate Regional Directors of the Federal Water Pollution Control Administration, the Fish and Wildlife Service, the National Park Service and the appropriate state conservation, resources, and water pollution agencies. The District Engineer is given the initial responsibility of evaluating all relevant factors in reaching a decision as to whether the particular permit involved should be granted or denied. The Memorandum also provides that in case of conflicting views the ultimate decision shall be made by the Secretary of the Army after consultation with the Secretary of the Interior.

This Executive action has almost a virtual legislative imprimatur from the November 1967 Report of the House Committee on Merchant Marine and Fish-

eries, in reporting favorably on a bill [22] to protect estuarine areas which was later enacted into law.[23] As a result of the effective operation of the Interdepartmental Memorandum of Understanding, the Interior Department and the Committee concluded that it was not necessary to provide for dual permits from Interior and Army.

The intent of the three branches has been unequivocally expressed: The Secretary must weigh the effect a dredge and fill project will have on conservation before he issues a permit lifting the Congressional ban.

The parallel of momentum as the three branches shape a national policy gets added impetus from the National Environmental Policy Act of 1969, Public Law 91–190, 42 U.S.C.A. §§ 4331–4347. This Act essentially states that every federal agency shall consider ecological factors when dealing with activities which may have an impact on man's environment.[24]

advantages and benefits of the operations in relation to the resultant loss or damage, including all data presented by the Secretary of the Interior, and will either deny the permit or include such conditions in the permit as he determines to be in the public interest, including provisions that will assure compliance with water quality standards established in accordance with law. * * *."

22. H.Rept. 989, 90th Cong., 1st sess., to accompany H.R. 25, pp. 4–5. See also S.Rept. No. 1419, July 17, 1968, 90th Cong., 2d sess., Senate Committee on Commerce, reporting on S. 695 and H.R. 25, pp. 13–14. H.R. 25 with revisions became the Act of August 3, 1968, 82 Stat. 625 (Pub.L. 90–454).

23. "As a result of the hearings and the discussions which ensued from the circularized draft proposal—particularly with respect to the permit provision for dredging, filling, and excavation—a memorandum of understanding was entered into between the Secretary of the Interior and the Secretary of the Army. This agreement set forth the policies and procedures to be followed regarding the control of dredging, filling, and excavation in the navigable waters of the

United States, which would include many of our Nation's estuarine areas.
On August 2, the Department of the Interior filed a supplemental report on the bill. In its report to the committee, the Department stated that we believe that this memorandum of understanding provides an effective administrative solution to the problem of preventing unreasonable impairment of the natural resources of the Nation's waterways and related environment, and preventing the pollution of the waters. In our opinion, the agreement makes the legislative approach set forth in H.R. 25 * * * for control for dredging, et cetera, unnecessary * * * (Omissions by the Committee.)."

24. Its newness, relevance and significance warrant reproduction in full.
"This Act may be cited as the 'National Environmental Policy Act of 1969'.

*PURPOSE*

Sec. 2. The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the under-

standing of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## TITLE I
### DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

Sec. 101(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consolidation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and order major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards,

Although this Congressional command was not in existence at the time the permit in question was denied, the correctness of that decision must be determined by the applicable standards of today. The national policy is set forth in plain terms in § 101 and the disclaimer of § 104(3) neither affects it nor the duty of all departments to consider, consult, collaborate and conclude. For we hold that while it is still the action of the Secretary of the Army on the recommendation of the Chief of Engineers, the Army must consult with, consider and receive, and then evaluate the recommendations of all of these other agencies articulately on all these environmental factors. In rejecting a permit on non-navigational grounds, the Secretary of the Army does not abdicate his sole ultimate responsibility and authority. Rather in weighing the application, the Secretary of the Army is acting under a Congressional mandate to collaborate and consider all of these factors.[25]

To judge the ebb and flow of the national tide, he can look to the Report of the House Committee on Government Operations. Although this perhaps lacks traditional standing of legislative history, it certainly has relevance somewhat comparable to an Executive Commission Report. On March 17, 1970, it approved

shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative use of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by title II of this Act.

Sec. 103. All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this Act and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this Act.

Sec. 104. Nothing in Section 102 or 103 shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

Sec. 105. The policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies."

Public Law 91–190, Title I, 83 Stat. 852. 42 U.S.C.A. §§ 4331–4347.

25. For like reasons the following disclaimer in the Fish and Wildlife Act of 1956, 70 Stat. 1119, 16 U.S.C.A. §§ 742a–742j, specifically 70 Stat. 1124, 16 U.S.C.A. § 742i is not decisive:

"THE RIGHTS OF STATES.—Nothing in this Act (subsection 742a and note—742d, 742e–742j of this title; 15 subsection 713c–3 and note) shall be construed (1) to interfere in any manner with the rights 'of any State under the Submerged Lands Act (Public Law 31, Eighty-third Congress) (43 subsection 1301 and notes—1303, 1311–1315) or otherwise provided by law, or to supersede any regulatory authority over fisheries exercised by the States either individually or under interstate compacts;"

and adopted a Report,[26] based on a study made by its Conservation and Natural Resources Subcommittee, entitled Our Waters and Wetlands: How the Corps of Engineers Can Help Prevent Their Destruction and Pollution. (H.Rep. No. 91–917, 91st Cong. 2d Sess. (1970)) The first section stifles any doubt as to how this part of Congress construes the Corps' duty under the Rivers and Harbors Act. The section traces the historical interpretation of the Corps' power under the Rivers and Harbors Act. It commends the Corps for recognizing ecological considerations under the Act to protect against unnecessary fills and cites the instant case.[27] But following the temper of the times, the report by bold face black type cautions against any easy overconfidence and charges the Corps with ever-increasing vigilance.[28]

■ When the House Report and the National Environmental Policy Act of 1969 are considered together with the Fish and Wildlife Coordination Act and its interpretations, there is no doubt that the Secretary can refuse on conservation grounds to grant a permit under the Rivers and Harbors Act.

## V

### Due Process

■ Landholders next contend that the denial of a permit without a hearing before the Fish and Wildlife Service is a deprivation of property without due process of law. Administrative

---

26. The heading of the Report reads:
"The Corps of Engineers, which is charged by Congress with the duty to protect the nation's navigable waters, should, when considering whether to approve applications for landfills, dredging and other work in navigable waters, increase its consideration of the effects which the proposed work will have, not only on navigation, but also on conservation of natural resources, fish and wildlife, air and water quality, esthetics, scenic view, historic sites, ecology, and other public interest aspects of the waterway."

27. "In 1968, the Corps revised its regulations to state that the Corps, in considering an application for a permit to fill, dredge, discharge or deposit materials, or conduct other activities affecting navigable waters, will evaluate "all relevant factors, including the effect of the proposed work on navigation, fish and wildlife, conservation, pollution, esthetics, ecology, and the general public interest." 33 CFR 209.120(d)(1).[4] The Corps applied this policy when it recently rejected the efforts of land developers to fill in a major part of Boca Ciega Bay, near St. Petersburg, Fla. See Zabel v. Tabb, 296 F.Supp. 764 (D.C.M.D.Fla., Tampa Div., Feb. 17, 1969), now on appeal to the U. S. Court of Appeals, Fifth Circuit, 430 F. 2d 199.
The committee commends the Corps for recognizing its broader responsibilities to protect against unnecessary fills

and other alteration of water bodies.
* * *"
H.Rep. No. 91–917, p. 5.

28. "The Corps of Engineers should instruct its district engineers and other personnel involved in considering applications for fills, dredging, or other work in estuaries, rivers, and other bodies of navigable water to increase their emphasis on how the work will affect all aspects of the public interest, including not only navigation but also conservation of natural resources, fish and wildlife, air and water quality, esthetics, scenic view, historic sites, ecology, and other public interest aspects of the waterway."
H.Rep. No. 91–917.
As the Committee views it, not only should the Corps consider conservation, but it should consider conservation to be endangered by every dredge and fill project and place the burden of proving otherwise on the applicant. See, e. g., the conclusion of the first section of the Report and its bold face type recommendation:
"The Corps of Engineers should permit no further landfills or other work in the Nation's estuaries, rivers and other waterways except in those cases where the applicant affirmatively proves that the proposed work is in accord with the public interest, including the need to avoid the piecemeal destruction of these water areas."
H.Rep. No. 91–917, p. 6.

law requires that before an agency can regulate a party, it must allow that party to be heard. Here, Landholders were given such a hearing before the Corps of Engineers, the body empowered to grant or deny a permit. They were not entitled to a hearing before the Fish and Wildlife Service because it is not "the one who decides." Morgan v. United States, 1935, 289 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288, 1295. They were allowed to rebut the findings and conclusions of the Fish and Wildlife Service before the deciding body and thus were not denied due process for lack of a hearing.

## VI

### Taking Without Compensation

Landholders' last contention is that their private submerged property was taken for public use without just compensation. They proceed this way: (i) the denial of a permit constitutes a taking since this is the only use to which the property could be put; (ii) the public use is as a breeding ground for wildlife; and (iii) for that use just compensation is due.

■ Our discussion of this contention begins and ends with the idea that there is no taking. The waters and underlying land are subject to the paramount servitude in the Federal government which the Submerged Lands Act expressly reserved as an incident of power incident to the Commerce Clause. (See Part II *supra*).

## VII

### Conclusion

Landholders' contentions fail on all grounds. The case is reversed and since there are no questions remaining to be resolved by the District Court, judgment is rendered for the Government and the associated agent-defendants.

Reversed and rendered.