333 So.2d 472 (1976)
PINELLAS COUNTY, a Political Subdivision of the State of Florida, et al., Appellants,
v.
LAKE PADGETT PINES, a Florida Co-Partnership, and Pasco County, a Political Subdivision of the State of Florida, Appellees.
Nos. 76-164, 76-184, 76-223, 76-248, 76-270 and 76-301.
District Court of Appeal of Florida, Second District.
June 4, 1976.
Rehearing Denied July 1, 1976.
*473 John T. Allen, Jr., St. Petersburg, and W. Gray Dunlap, County Atty., Clearwater, for Pinellas County.
Carl R. Linn, City Atty., St. Petersburg, for City of St. Petersburg.
A. Fletcher Dyches and Thomas E. Cone, Jr., of Gibbons, Tucker, McEwen, Smith, Cofer & Taub, Tampa, for Southwest Florida Water Management District.
Louis F. Hubener, III, Tallahassee, for Division of State Planning.
Louis de la Parte, Jr., Tampa, for West Coast Regional Water Supply Authority.
Roger S. Tucker, St. Petersburg, for Tampa Bay Regional Planning Council.
Barry Lessinger, Tallahassee, and Michael H. Feiler, Detroit, Mich., for appellee, Lake Padgett Pines.
Jacob D. Varn, Roger D. Schwenke, and Steven L. Sparkman, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for appellee Pasco County.
SCHEB, Judge.
The central issue on this appeal is whether the trial court erred in holding the Cypress Creek Well Field project in Pasco County to be a "development of regional impact" as defined in Fla. Stat. Ch. 380. We hold it did and reverse.
Appellee/plaintiff Lake Padgett Pines, a Florida partnership, filed its complaint naming Pasco County and the appellants herein as defendants; the appellants being those several governmental entities involved in various roles in the project. Pasco County, not having taken an appeal, is now an appellee before this court.
Development of the Cypress Creek Well Field in Pasco County was undertaken to furnish water to densely populated Pinellas County. The plaintiff, a developer with large land holdings nearby the project, alleged that the construction and operation of the well field constituted a development of regional impact (DRI) which was proceeding without complying with Ch. 380. Lake Padgett contended that, as a result of the project, it would suffer damages different in kind from those which may occur to the general public in that the well field will jeopardize the water supply from its own wells, lower the level of the lakes on its property, and result in other damages peculiar to its lands. It sought to enjoin the appellants from continuing the project and from pumping from the well field until compliance with the requirements of Ch. 380.
At the present posture of this case, we find a summary judgment entered in favor of the plaintiff Lake Padgett with the trial judge having found that the Cypress Creek Well Field (and a flood detention area which was "inextricably related") were DRI's under Ch. 380. In a supplemental judgment the trial court ordered compliance with Ch. 380, and enjoined continuation of the project until such compliance was effectuated, with the stipulation that if *474 the development does not meet such requirements, then the defendants were "permanently and forever restrained and enjoined from further development activities upon said water retention or well field project."[1] The appellants challenge this determination made by the trial court while Pasco County supports Lake Padgett's position that the court correctly found the project to be a DRI under Ch. 380.
Prefatory to discussing the applicability of Ch. 380, we address procedural questions raised on this appeal as to whether Lake Padgett, a partnership, had capacity to bring suit without joinder of all of its partners and, if so, whether it had the requisite standing to seek to enjoin the alleged violation.
Under the common law, a partnership cannot sue or be sued in its firm name. At common law such a business organization had no identity apart form its members and not being a person, either natural or artificial, it could neither take nor hold legal title to real estate. 60 Am.Jur.2d, Partnership, § 88; 24 Fla.Jur., Partnership, § 46. Restrictions on holding and conveying real property were eliminated by Florida's adoption of the Uniform Partnership Act.[2] Since 1972, Fla. Stat. § 620.595 has authorized a partnership to acquire and convey real property in the partnership name. We recognize that in Aronovitz v. Stein Properties, Fla.App.3d 1975, 322 So.2d 74, our sister court held that notwithstanding the new Act, each partner who had an interest under a contract was an indispensible party to a complaint seeking enforcement of the contract. In our judgment such a construction cannot be applied to preclude Lake Padgett, a partnership with statutory authority to hold and convey title to real property in its partnership name, from litigating to protect its interest in that real property. To this extent, we find the instant case distinguishable from Aronovitz. Moreover, in view of RCP 1.210, which provides for actions to be prosecuted by the real party in interest, it appears that a partnership recognized as an entity for the purpose of holding and conveying title would, indeed, be such a party.[3]
Appellants' contention that Lake Padgett lacks standing to sue stems primarily from this court's opinion in Sarasota County v. General Development Corp., Fla.App.2d 1976, 325 So.2d 45. There, Sarasota County sought a declaratory judgment that General Development was in violation of Ch. 380, and this court, speaking through Judge Boardman, held that the City of North Port, wherein the affected lands were situate, was the only local government with standing to seek to enjoin alleged violations of Ch. 380, and that under the statutory scheme set out in Fla. Stat. § 380.07(2), the county which had neither title to nor zoning authority over the lands lacked standing to enter the controversy. Fla. Stat. § 380.07(2), affords ample protection of the interest of the general public by authorizing the local government and the appropriate regional planning agency and the State Land Planning Agency to appeal matters concerning DRI's directly to the Florida Land and Water Adjudicatory Commission. And, to have sanctioned the county injecting itself into that controversy would merely have placed an additional layer of government into the statutory scheme of protection of the public. While intervention of that character could have been provided for under the statute, it has *475 not been so expressed by the Legislature. Here, however, as an owner of substantial nearby land holdings, Lake Padgett alleged and the trial court determined that the damages which could accrue to Lake Padgett from a project of this character and magnitude would be materially different in kind from those affecting the public generally. While governmental agencies exercise concern for the general public; nevertheless, a private owner in these instances frequently will have a more direct concern where, as here, such a project has the potential of greatly affecting its own lands. We think these factors adequately distinguish this case from the Sarasota County case, and in our judgment Lake Padgett Pines, as a partnership entity, has not only the capacity but also the requisite standing to litigate the question now under review.
The crux of this dispute between the plaintiff Lake Padgett and the governmental entities which are appellants is whether the regulatory aspects of the Cypress Creek Well Field project, particularly as relate to their environmental impact, are controlled by Fla. Stat. Ch. 373 or Ch. 380. Our determination of this fundamental issue pretermits discussion of various other substantive points raised on appeal.
For perspective, a brief review of the history and the legislatively declared purposes of each of these two statutory enactments is essential. Ch. 373 is derived from the "Florida Water Resources Act" enacted as Ch. 72-299, Laws of Florida, while Ch. 380 had its origin in Ch. 72-317, Laws of Florida, entitled "The Florida Environmental Land and Water Management Act." Each of these enactments was a product of the environmentally conscious Legislature of 1972. The Governor signed each Act on the same date and each was filed with the Secretary of State on April 25, 1972.
In Ch. 72-299 (Fla. Stat. § 373.016) the legislature declared as policy:
(1) The waters in the state are among its basic resources. Such waters have not heretofore been conserved or fully controlled to realize their full beneficial use.
(2) It is further declared to be the policy of the legislature to provide for the management of water and related land resources; to promote the conservation, development, and proper utilization of surface and ground water; to develop and regulate dams, impoundments, reservoirs, and other works, and to provide water storage for beneficial purposes; to prevent damage from floods, soil erosion and excessive drainage; to preserve natural resources, fish and wildlife; to promote recreational development, protect public lands, assist in maintaining the navigability of rivers and harbors; and to otherwise promote the health, safety and general welfare of the people of this state.
(3) The legislature recognizes that the water resources problems of the state vary from region to region, both in magnitude and complexity. It is therefore the intent of the legislature to vest in the department of natural resources or its successor agency the power and responsibility to accomplish the conservation, protection, management and control of the waters of the state with sufficient flexibility and discretion to accomplish these ends through delegation of appropriate powers to the various water management districts. The department may exercise any power herein authorized to be exercised by a water management district; however, to the greatest extent practicable such power should be delegated to the governing board of a water management district.
while in Ch. 72-317 (Fla. Stat. § 380.021) the legislative purpose was set forth as:
It is the legislative intent that, in order to protect the natural resources and environment of this state as provided in section 7 of article II of the constitution of this state, and to insure a water management *476 system that will reverse the deterioration of water quality and provide optimum utilization of our limited water resources, and to facilitate orderly and well planned development, and to protect the health, welfare, safety, and quality of life of the residents of this state, it is necessary to adequately plan for and guide growth and development within this state. In order to accomplish these purposes, it is necessary that the State of Florida establish land and water management policies to guide and coordinate local decisions relating to growth and development, and that such state land and water management policies should to the maximum possible extent be implemented by local governments through existing processes for the guidance of growth and development, and that all the existing rights of private property be preserved in accord with the constitution of this state and of the United States.
Thus we must view the factual context of this controversy in the light of two statutes, each enacted with the obvious underlying purpose of protecting the environmental resources of the state.
The Cypress Creek project was conceived to supply badly needed water to the City of St. Petersburg and Pinellas County areas. Toward this primary objective, the Southwest Florida Water Management District (SWFWMD), one of the water management districts referred to in the Florida Water Resources Act of 1972, on November 14, 1973, entered into an agreement with Pinellas County, Pasco County, Hillsborough River Basin, and the City of St. Petersburg, dealing with the Cypress Creek Well Field. Therein, the parties agreed that certain lands consisting of approximately 9,000 acres in Pasco County should be immediately acquired and used for the purposes of flood control, a fresh water well field, wild life refuge, and open space recreational area. The agreement provided for title to the lands acquired to be placed in the name of the District (as SWFWMD and the Hillsborough River Basin are referred to collectively) for the benefit of the District, Pinellas County, Pasco County and the City of St. Petersburg. The project was to proceed in several phases to accomplish the intended purposes. Phase I was to be land acquisition, Phase II was to be construction of test wells and testing of same, with Phase III to be the construction and operation of a well field to supply water to Pinellas County and the City of St. Petersburg. The agreement further provided that the Cypress Creek test program was to be subject to exhaustive tests by engineers, hydrologists, and planners, chosen by all parties to determine if a permanent well field upon the lands would be economically and hydrologically feasible.
Although the referred to agreement was not entered into until late 1973, efforts to obtain water from Cypress Creek commenced with initial land acquisitions and planning as far back as 1971. By the time this suit was filed in April 1975, the project was approaching the stage of development that it could be utilized for production of water. Testimony showed that the planned facilities were about 95% complete by January 26, 1976, when the trial court entered final judgment. By that time some 4.3 million dollars had been committed to the facilities. SWFWMD on January 14, 1976, had authorized the pumping of 10 million gallons per day at a consistent rate for 12 months. The appellants presented testimony that if during the withdrawal tests any harm was done to the area, that SWFWMD would require pumping to be decreased or ceased altogether.
Lake Padgett contends that the Cypress Creek project falls within the definition of "development" which under § 380.04(1) is defined as:
"`Development' means the carrying out of any building or mining operation or the making of any material change in the use or appearance of any structure *477 or land and the dividing of land into three or more parcels."
"Land" is defined in § 380.031(6) as including "... the earth, water, and air, above, below, or on the surface, and includes any improvements or structures customarily regarded as land." Pasco County agrees with Lake Padgett, noting that it has consistently maintained the project must be approved by it as the local agency with authority to grant initial approval of DRI's under Fla. Stat. § 380.06. Both Lake Padgett and Pasco County view the Cypress Creek Well Field Project as a development of regional impact which is statutorily defined in § 380.06(1) as:
"... any development which, because of its character, magnitude, or location, would have a substantial effect upon the health, safety or welfare of citizens of more than one county."
Pointing out that the legislature intended "to insure a water management system that will reverse deterioration of water quality and provide optimum utilization of our limited water resources," as one of the purposes of Ch. 380, both Lake Padgett and Pasco County urge that we affirm the trial judge's finding that the project here falls under Ch. 380. They argue there is a demonstrable need to go beyond the hydrological and into the economic, social and environmental impact of the proposed project. Because of the potential impact of this project as a large scale regional well field and flood detention area, they argue it must receive the environmental review contemplated by § 380.06, which statute they view as implementing the constitutional mandate of Art. II, § 7, of the Florida Constitution of 1968.[4]
The governmental entities, on the other hand, contend that Ch. 380 is inapplicable to the project.[5] They argue that Ch. 373 controls water resources in the State of Florida to the exclusion of Ch. 380, and since no contention is made that the project is not in compliance with Ch. 373, then there are no obstacles to proceeding. They point to implementation of Ch. 380 by Ch. 22F-2, Florida Administrative Code, approved by the 1973 Legislature by House Concurrent Resolution No. 1039, Laws of Florida, 1973, and note that in the specific list of developments of regional impact that water withdrawal or well field construction is noticeably absent from the list which enumerates only projects more traditionally considered as land developments. Conversely, they argue that Ch. 373 addresses water withdrawal and well field construction with specificity. The 1972 Legislature, they state, faced with a history of population explosion and the proliferation of land developments throughout the state and attendant water resource problems addressed both problems and enacted separate and distinct statutes, each of which must and can be given a valid sphere of operation without destroying the intent or meaning of either. In effect then, they contend the two statutes complement one another with Ch. 380 dealing with land development and management and with Ch. 373 addressing specifically the water resource management problems.
While acknowledging that Ch. 22F-2 does not specifically itemize "well fields" as a development of regional impact, Lake Padgett contends that these administrative guidelines do not necessarily list all possible DRI's but only those which are presumed to be DRI's. In any event, Lake *478 Padgett argues that such guidelines cannot amend the statutory definition of a DRI in § 380.06(1), which it contends is "self-executing" and requires no further legislative action. Our conclusions make it unnecessary to pass on whether or not the enumerations in 22F-2 are all inclusive or whether the DRI definition in Fla. Stat. § 380.06(1) is self-executing.
We have examined the ambit of operation of each of these concurrently enacted statutes. They can and should be construed in harmony with one another in their roles of protecting and conserving our environmental resources and promoting planned developments. In enacting Ch. 373, the Legislature provided for the management of water and related land resources and vested authority in the Department of Environmental Regulations to accomplish the task of conserving, protecting, managing, and controlling the water resources principally through delegation to water management districts. Fla. Stat. § 373.016. Thus the Legislature divided the state into water management districts, SWFWMD being one of those districts. Fla. Stat. § 373.069. Amendments to Ch. 373, enacted by the 1974 Legislature, Ch. 74-114, § 1(2), Laws of Florida, provided for creation of Regional Water Supply Authorities by agreement among local governmental units pursuant to the Florida Interlocal Cooperation Act (Fla. Stat. § 163.01) upon approval of the governor and cabinet sitting as head of the Department of National Resources.[6] Water management districts engage only in those functions that are incidental to the exercise of their flood control and water management powers, but may establish water production and transmission facilities for the purpose of supplying water to such counties, municipalities, and regional water supply authorities. Fla. Stat. §§ 373.196; 373.1961. It appears that under Ch. 373, as amended, that while the legislative intent was for municipalities and counties to have an important role, that regional water supply authorities are given the overriding responsibility for water supply.
Environmental aspects were emphasized by the Legislature in 1974, when it amended Ch. 373 to direct that the water management districts and the regional water supply authorities develop, store, and supply water for county or municipal purposes in such manner as will give priority to reducing and adverse environmental effects of excessive or improper withdrawals of water from concentrated areas. Fla. Stat. §§ 373.1961; 373.1962.
As we view Ch. 380, the Legislature intended that to facilitate orderly growth, it was necessary that the state establish overall policies to guide developments within the state, to better protect the quality of life of our present and future residents. Fla. Stat. § 380.021. We recognize the need for such planning and applaud the efforts being made to guide such growth with continued protection of private property interests.
But we are not dealing here in the first instance with a development which will have environmental impact, including an impact on water resources; rather, we are discussing a project specifically designed to provide water for already existing developments in urbanized areas demanding a water supply under Ch. 373. As mentioned, both the Southwest Florida Water Management District and the West Coast Regional Water Supply Authority are required by statute to proceed in such a manner as to reduce any adverse environmental effects of improper or excessive withdrawals of water from the well fields in Pasco County. And, while we recognize the apprehensions of Lake Padgett and Pasco County, we must presume that these apprehensions have been considered and the environmental impact determined before the parties arrived at the Cypress Creek Well Field agreement, and that the *479 environmental impact will be continually monitored by these governmental agencies. SWFWMD's authorized test pumping program is designed with this in mind.
Lake Padgett and Pasco County contend that a project of this magnitude will have an impact on resources aside from water and that the "multi-disciplinary scrutiny" contemplated by Ch. 380 should be brought into play for protection of the public. However, Ch. 373 is to be liberally construed for effectuating the purposes described in the chaper and these purposes clearly mandate consideration of the total environment, Fla. Stat. § 373.6161. And, given this statutory duty on the part of the agencies to consider the environmental impact of any water withdrawal project, we think such considerations can and should take into account the entire effects of the project and not merely be limited to the effects on a single resource. Cf., Zabel v. Tabb, 5th Cir.1970, 430 F.2d 199.
Placing the project solely under Ch. 373 for environmental supervision is fortified by the fact that under Ch. 380, the initial decision as to whether to approve a development of regional impact is placed in the hands of the local governmental body with an appeal to the Florida Land and Water Adjudicatory Commission. It is understandable that where, as here, a project is designed to furnish water to a different county from that where the project is located, the home county could well be reluctant to issue the required approval under Ch. 380.[7] This could be devastating to an urban community with limited water resources. The Regional Water Management Districts and the water supply authorities established under Ch. 373 appear to be better structured to make such initial determination on the basis of resolving water problems on a regional rather than a local basis. With water being vital to human existence and considering that water resource problems vary from one region to another, it is desirable that these determinations be made on a regional, rather than on a county or municipal level.
We think this consistent with the purpose clause of Ch. 373, which makes clear the Legislature intended "... to accomplish the conservation, protection, management, and control of the waters of the state with sufficient flexibility and discretion to accomplish these ends through delegation of appropriate powers to the various water management districts."
We have not overlooked that Ch. 380 does involve water in development of land. As mentioned above, the definitional section of the Act in § 380.031(6) provides that the word "land" includes "earth, water and air." There may well be projects which will bring into play regulatory aspects of both Chs. 373 and 380 concerning the supply of water. However, we do not believe that in establishing Ch. 380, the Legislature intended for local government to be in a position to control the actions taken under Ch. 373, when those very actions are vital to supplying water on a regional basis. The controversy before us lends emphasis to this premise since the Cypress Creek Project has been made necessary by existing developments rather than by proposed developments which undoubtedly require the "guidance of growth" referred to in the policy declaration of Ch. 380.
It is a cardinal rule of statutory construction that effect be given to the legislative intent of statutes passed at the same session dealing with the same general subject by considering them in pari materia, and that the court should find a reasonable field of operation for each of the statutes *480 without destroying their intent. Tamiami Trail Tours, Inc. v. City of Tampa, 1947, 159 Fla. 287, 31 So.2d 468. We believe that our conclusions provide an area of operation for each to the exclusion of the other in this instance, while still recognizing there may be situations in which the operation of both statutes may well come into play on a particular project.
In sum, it is our opinion that the Legislature considered that the environmental concerns of the State of Florida would be better met by holding that a development whose very purpose is to supply water under Ch. 373, should be regulated solely within the purview of the appropriate governmental agencies set up under that chapter, rather than under Ch. 380. These authorities are in a proper position to make determinations on basis of regional resolution of water problems and should not be thwarted in their efforts to supply water within their regions by the necessity of additional compliance with Ch. 380.
Accordingly, the judgment entered by the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.
BOARDMAN, Acting C.J., and GRIMES, J., concur.
NOTES
[1] On a hearing subsequent to issuing the injunction, the trial judge, finding that an emergency water shortage existed in Pinellas County, stayed the injunction, pending appeal, with the proviso that the defendants should only pump such water from the Cypress Creek Well Field as necessary to alleviate the emergency.
[2] Ch. 72-108, Fla. Stat. § 620.56, et seq.
[3] For further comment on the right of a partnership to sue or be sued under the U.P.A., see Jensen, Is a Partnership Under the Uniform Partnership Act an Aggregate or an Entity, 16 Vand.L.Rev. 377, 382-83 (1963); 60 Am.Jur.2d, Partnership, § 323.
[4] "Natural resources and scenic beauty.  It shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution and of excessive and unnecessary noise."
[5] The appellant Division of State Planning issued the appellants Pinellas County and City of St. Petersburg a "binding letter" under Fla. Stat. § 380.06(4)(a) that the Cypress Creek Well Field is not a DRI. In view of our holding that the project is not a DRI, we need not consider the trial court's holding that this letter was of no legal effect.
[6] The West Coast Regional Water Supply Authority was so created on October 25, 1974, pursuant to Ch. 74-114.
[7] We note that the home county is afforded protection, for as amended by the legislature in 1974 (Ch. 74-114 § 7(5)), Fla. Stat. § 373.1961 now provides that a water management district

"Shall not deprive, directly or indirectly, any county wherein water is withdrawn of the prior right to the reasonable and beneficial use of water which is required to supply adequately the reasonable and beneficial needs of the county or any of the inhabitants or property owners therein."